**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | | |
|---|---|---|
| **UNITED STATES SECURITIES AND EXCHANGE COMMISSION,** | : | |
| | : | |
| **Plaintiff,** | : | |
| | : | **Case No. C2-03-CV-326** |
| **v.** | : | |
| | : | |
| | : | **JUDGE ALGENON L. MARBLEY** |
| **SIERRA BROKERAGE SERVICES INC., ET AL.,** | : | |
| | : | **Magistrate Judge Abel** |
| | : | |
| **Defendants** | : | |

## OPINION & ORDER

## I. INTRODUCTION

The Securities and Exchange Commission ("SEC") filed this civil enforcement action against twelve defendants alleging that they violated registration, disclosure, and anti-fraud provisions of federal securities law in connection with the public sale of Bluepoint Linux Software Corporation's ("Bluepoint") shares. In Count I, the SEC claims that Defendants Aaron Tsai ("Tsai"), Michael Markow ("Markow"), Global Guarantee Corporation ("Global Guarantee"), Francois Goelo ("Goelo"), Yongzhi Yang ("Yang"), K&J Consulting Ltd. ("K & J Consulting"), Ke Lou ("Lou"), M & M Management Ltd. ("M & M"), Sierra Brokerage Services, Inc. ("Sierra"), and Jeffrey Richardson ("Richardson") violated Sections 5(a) and 5(c) of the Securities Act of 1933 ("Securities Act"), 15 U.S.C. §§ 77e(a) and 77e(c), by trading securities in interstate commerce without filing registration statements. Counts II, III, IV, and VI of the Complaint allege that Defendants Markow, Global Guarantee, Goelo, Yang, K & J Consulting, Lou, M & M, Sierra, Richard Geiger ("Geiger"), and Richardson engaged in a

"pump and dump" scheme that manipulated the market price for Bluepoint shares on March 6, 2000, in violation of Sections 17(a)(1) and 17(a)(3) of the Securities Act, 15 U.S.C. §§ 77q(a)(1) and 77q(a)(3); Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78j(b), Rule 10b-5 thereunder, 17 C.F.R. §240.10b-5; and Section 15(c)(1) of the Exchange Act, 15 U.S.C. § 78o(c)(1). Counts VIII and IX allege that Defendants Tsai (acting individually), and Goelo (individually and as part of a group), Yang (individually and as part of a group), K& J Consulting, Markow, Global Guarantee, Lou, and M & M (acting collectively) failed to report their beneficial ownership of securities in violation of Section 13(d) of the Exchange Act, 15 U.S.C. §§ 78m(d)(1) and (2), Rules 13d-1(a) and 13d-2(a) thereunder, 17 C.F.R. §§ 240.13d-1, 240.13d-2; and Section 16(a) of the Exchange Act, 15 U.S.C. § 78p(a) and Rule 16a-3 thereunder, 17 C.F.R. §§ 240.16a-3.

Now before the Court is the SEC's motion for summary judgment (doc. no. 124) against Defendants Tsai, Markow, Global Guarantee, Yang, K & J Consulting, Lou, M & M, Goelo, Sierra, and Richardson on the Section 5 registration claim (Count I) and on the Section 13(d) and 16(a) disclosure claims (Counts VIII and IX). Defendants Tsai, Markow, Global Guarantee, Goelo, Yang, K & J Consulting, Lou, M & M, and Geiger (collectively "Defendants") have cross motioned for summary judgment on the registration and disclosure counts (Counts I, VIII, and IX) and also seek summary judgment on the market manipulation scheme counts (Counts II, III, IV, and VI). (Doc. no. 112). For the reasons explained below, the SEC's motion is **GRANTED in PART** and **DENIED in PART** and the Defendants' motion is **DENIED**.

## II. BACKGROUND

### A. Facts

This case centers on Defendant Tsai's creation of MAS Acquisition XI Corporation ("MAS XI"), a "shell" company that ultimately merged with Bluepoint and sold shares to the public on the Over-the-Counter Bulletin Board in March of 2000. The SEC maintains that the Defendants' conduct relating to that process repeatedly violated the federal securities laws.

"Shell companies," like MAS XI, are also referred to as "blank check" companies. Shell companies or blank check companies are formed with the purpose of qualifying for public trading on the Over-the-Counter Bulletin Board and later being sold to a privately-held company. The private company is then merged into the shell. To accomplish the reverse merger, the public shell company exchanges its stock with the outstanding shares of the private company. The shareholders in control of the shell company transfer most of their shares to the owners of the private company.

The public shell company often changes its name to the name previously used by the private company and continues the business activity of the formerly private company except that the company is now an issuer of publicly traded securities. *See SEC v. M & A West, Inc.*, No. C-01-3376, 2005 WL 1514101, at *2 (N.D. Cal. June 20, 2005) (explaining reverse mergers). This process allows the private company to go public cheaply, i.e., without the expense of an initial public offering. *See SEC v. Kern*, 425 F.3d 143, 146 (2d Cir. 2005). Shell companies have no assets or revenue; instead, they exist merely to serve as a vehicle for the businesses activities of the company which merges into them. *See Black's Law Dictionary* 149 (2d Pocket Ed. 2001).

*1.  Defendants*

Tsai is a resident of Taiwan.  Tsai controls MAS Capital Securities, Inc., a U.S. incorporated securities broker-dealer that is registered with the SEC.  From 1996 to 2000, he formed 101 public shell corporations.  The shell companies were created so that they could be merged with private companies that want to go public.  One of those shell companies was MAS XI, which ultimately was merged with Bluepoint.

Tsai is experienced in the securities industry.  Between 1998 and 2000, Tsai was a registered representative of five brokerage firms.  He is also educated in the securities industry.  Between 1998 and 1999, he took and passed several exams related to the securities industry including: (1) the Series 7 exam, a New York Stock Exchange exam for stock brokers which Tsai passed with high marks in 1998; (2) the Series 24 exam, which is a securities principal license exam for managers of brokerage firms; (3) the Series 28 exam; (4) the Series 55 exam for stock traders; and (5) the Series 63 exam, which covers state regulations regarding securities.

Tsai also has experience with securities violation litigation.  On April 4, 2005, final judgment was entered against him by the District Court for the Middle District of Florida enjoining him from future violations of the registration provisions of the federal securities laws and ordering disgorgement and civil penalties.  *SEC v. Surgilight Inc*., SEC Litig. Release No. 19169, 2005 WL 770873 (Apr. 6, 2005) (M.D. Fla. Case No. 6:02-CV-413).  Tsai consented to the final judgment without admitting or denying the allegations against him.  *Id*.

a.  Promoter Defendants

Defendants Yang, Markow, Goelo, Lou, K&J Consulting (Yang's company), Global Guarantee (Markow's company), and M & M (Lou's company) are collectively referred to throughout this Opinion as the "Promoter Defendants."   Yang is a California resident.  He

currently works as a business consultant and owns his own building materials importer business. Yang holds a Ph.D. in mathematics and has a computer science background.

In 1999, Yang worked as a consultant for Shenzen Sinx Software Technology Corporation, which was later renamed Bluepoint. In that role, Yang was responsible for finding an American public shell corporation into which Bluepoint could merge. He was ultimately involved in negotiating and consummating the reverse merger between Max XI and Bluepoint. Yang controls K & J Consulting, Ltd, a British Virgin Islands company, through which he held and traded Bluepoint stock in 2000.

Like Tsai, Yang is no stranger to securities litigation. On February 28, 2005 the District Court for the Central District of California entered a final judgment against Yang in *SEC v. Hartcourt Companies.* SEC Litig. Release No. 19133, 2005 WL 597024 (Mar. 15, 2005) (C.D. Cal. Case no. CV 03-3698). The Court enjoined him from future violations of the registration and anti-fraud provisions of federal securities law, ordered $186,619 in disgorgement, and imposed $20,000 in civil penalties.

Markow is a California resident. He is a financial consultant with substantial experience conducting reverse mergers. He formed and controls Global Guarantee, which consults with other companies regarding their business plans and financing. In 2000, Markow acquired and sold Blue Point stock through Global Guarantee. He facilitated the reverse merger between MAS XI and Bluepoint.

Markow is a repeated securities law violator. In 1994, 1995, and 1999, the National Association of Securities Dealers ("NASD") held Markow liable for monetary awards in arbitration proceedings based on his securities-related misconduct. (NASD Arbitration Awards; 12/3/2004 Markow Dep. 220-221, 223.) In 1998, California issued two "desist and refrain"

orders against him for operating as a broker-dealer without a license and for selling securities that had not been qualified. (5/15/1998 Cal. Desist and Refrain Orders). In 2000, Alabama issued a "cease and desist" order against him for operating as an unregistered broker dealer. (3/3/2000 Ala. Cease and Desist Order.)

Goelo is a resident of the Cayman Islands. Goelo knew Yang through internet investor message boards. He also knew Markow from his reputation as a professional in facilitating reverse mergers. When he learned that Yang was interested in taking Bluepoint public and trading on the American market, Goelo introduced Yang to Markow. Goelo owns and controls Xplorer Ltd. and Unikay Ltd. through which he bought and sold Bluepoint stock in 2000.

Luo is a citizen of the People's Republic of China but is a Georgia resident. He controls M & M, a Virgin Islands company through which he bought and sold Bluepoint stock in 2000.

### b. Other Defendants

Richardson is the president, head trader and part-owner of Sierra a broker-dealer located in Columbus Ohio. Sierra served as a market-maker for Bluepoint when it began trading on the OTCBB. Geiger was a representative and trader at Sierra. He was ultimately fired. Sierra stopped operating in April 2003.

NASD has repeatedly fined Sierra, Richardson, and Geiger for improper practices in as follows:

- July 2003: Richardson permanently barred by NASD from association with any member of NASD because of his sales of unregistered securities. (Certified NASD Letter of Acceptance, Waiver & Consent, No. CMS030156 (July 2003).)

- January 2003: Sierra fined $5,000 for buying and selling securities without maintaining its minimum net capital (Certified NASD Letter of Acceptance, Waiver & Consent, No. C8B030001 (Jan. 2003).)

- July 2002: Sierra fined $10,000 jointly and severally with Richardson because Richardson permitted Geiger and other Sierra employees to work as equity traders

without being registered. (Certified NASD Letter of Acceptance, Waiver & Consent, No. C8B020014 (July 2002).) Geiger was also fined $10,000 for this incident and suspended from association with any NASD member for 20 days. (Certified Web CDR for Richard Geiger.)

- June 2000: Sierra $15,000 and Richardson $5,000 for failing to accurately record the time and execution of securities sales in violation of NASD's rules. (Certified NASD Letter of Acceptance, Waiver & Consent, No. C8A000036 (June 2000).)

- November 1998: Sierra fined $2,500 for failing to report transactions accurately and timely and for failing to develop or document training procedures. (Certified NASD Letter of Acceptance, Waiver & Consent, No. C8B980040 (Nov. 1998).)

- January 1997: While working at a different firm, i.e., not Sierra, Geiger was fined $10,000, suspended ten days, and barred from acting as a securities firm principal for one year because of his behavior at another trading firm. (Certified Web CDR for Richard Geiger.) Based on this censure, the state of Ohio refused to grant Geiger a securities sales license. (*Id*.)

### 2. *Formation of the Shell Company, MAS XI*

On October 7, 1996, Tsai incorporated MAS XI in Indiana. MAS XI was a shell company with no business activity or operations of its own. It existed only to issue shares of stock and to be available for a reverse merger. MAS XI was authorized by its articles of incorporation to issue 80 million shares of common stock and 20 million shares of preferred stock. On the date of its incorporation, MAS XI issued 8.5 million shares of common stock to Tsai. He reported his beneficial ownership of 8.25 million shares with the SEC.[1] Tsai was the CEO, president, and treasurer of MAS XI from its inception.

As with his other shell corporations, Tsai formed MAS XI as a vehicle to accomplish a reverse merger in the future. To make MAS XI an attractive candidate for a reverse merger, Tsai wanted to register the company as a voluntary reporting company with the SEC and to clear

---

[1] As explained below, the 8.25 million share figure reflected the fact that Tsai gave 250,000 of his shares away.

its stock for trading on the Over-the-Counter Bulletin Board ("OTCBB").[2]  Consequently, in

April of 1999, Tsai made MAS XI a voluntary reporting company with the SEC by filing a Form

10-SB.  In the Form 10-SB and subsequent related SEC filings, Tsai reported his transfer of

MAS XI shares to individual shareholders in 1997-1998.

### 3. Initial Transfers to Five "Former Director" Shareholders

Tsai and MAS XI transferred shares to five individuals in 1997 and 1998.  No registration

statements were filed for these transfers.  In his SEC filing, Tsai claimed that five people were

former MAS XI directors.  The five shareholders were: April C., David Carra ("Carra"), Charles

Roberson ("Roberson"), Stephen Lee ("Lee"), and Rick Hemmer ("Hemmer") (collectively

"former directors").  April C. is a mentally disabled person who has lived in a group home since

1997.  According to April C.'s case manager, April C. would not be able to understand what a

corporate director is, what shares of stock are worth, or what legal documents, such as stock

powers, mean.  (11/9/2004 Hawkins Dep. 34-35.)  Carra was a janitor in 1997 but is currently

unemployed.  Hemmer currently works in auto assembly and previously worked as a shoe

salesman.  Lee is currently a financial consultant and worked for an import/export company in

1997.  (4/30/2004 Lee Dep. 10-12.)  At least three of the five former directors were unaware of

ever having been MAS XI directors.  (4/29/2004 Hemmler Dep. 26, 37; 7/21/2004 Carra Dep.

12, 15; 4/30/2004 Lee Dep. 31.)  Similarly, Roberson testified that while he remembers signing

something with the word director on it, he did not think he would be required to perform any

---

[2]  The OCTBB is an electronic public securities market that is overseen by NASD.  Companies
trading on the OCTBB must be reporting.

duties as a director.[3]  (8/28/2000 Roberson Dep. 39-40.)  All of the shares held by the five former directors were "restricted," meaning that they could not be traded publicly.

MAS XI issued shares to the five former directors on two occasions.  First, on January 1, 1997, MAS XI issued 500 shares of common stock to five former directors.  Second, on September 30, 1998, MAS XI issued an additional 750 shares to those same five people.  Tsai reported to the SEC that MAS XI transferred those shares to the former directors as "compensation for their services" as directors. (6/22/1999 Form 10-SB/A 27.)  At his deposition, however, Tsai admitted that three of the purported former directors—April C., Lee, and Hemmer—never performed any services for MAS XI.  (10/19/2004 Tsai Dep. 92.)  He also testified that he does not remember if the other two, Carra and Roberson, performed any services for MAS XI.  (*Id*.)

On January 1, 1997, Tsai gave 50, 000 shares of his shares to each of the five former directors (a total of 250,000 shares).   The former director shareholders were not issued stock certificates at the time they became shareholders.  Instead, the shares held by the former directors were recorded as book entries.[4]  Stock certificates were only issued shortly before and in furtherance of MAS XI's merger with Bluepoint in 2000.

The five former director shareholders did not attend shareholder meetings.  Instead, Tsai held annual shareholder meetings by himself.  Although MAS XI's bylaws required that shareholders be sent notice of the time and place of shareholder meetings, Tsai does not remember ever doing so.  The five former director shareholders did not vote on MAS XI

---

[3]  Roberson further testified that he asked Tsai what his duties would be and that Tsai responded "that I may be asked at some point, if were a Director and I would say, yes.  But that I wouldn't have any of those duties associated with a Director."  (*Id*. 40.)

[4]  A "book entry" is a method of tracking ownership of securities in which no stock certificate is given to investors.  *See Black's Law Dictionary* 74 (2d Pocket Ed. 2001.)

directors. Instead, Tsai elected directors by himself during shareholder meetings at which he was the only attendee. Tsai does not remember sending out written consent to shareholders regarding actions taken without holding an annual or special shareholder meeting as required by the bylaws. Similarly, Tsai was the only MAS XI director at the time the bylaws went into effect even though three directors were required.

### 4. Transfer to 28 Additional Shareholders

In July of 1999, Tsai hired Kensington Capital Corporation ("Kensington") to help get MAS XI cleared for public trading on the OTCBB. As part of that process, MAS XI had to file a Form 211 with NASD. On July 26, 1999, NASD sent Kensington a letter stating that MAS XI's Form 211 application was deficient because MAS XI's tradable shares were concentrated in the hands of only five shareholders.

In response, Tsai arranged a transfer of shares from the five former director shareholders to 28 additional shareholders ("28 additional shareholders"). No registration statement was filed prior to this transfer. These transfers brought the number of MAS XI shareholders up to 33—the five original shareholders plus the 28 additional shareholders (collectively "MAS XI Shareholders"). The additional shareholders were Tsai's friends or people he met at bible study. Tsai arbitrarily decided how many shares to transfer away from the five former directors and how many shares each of the 28 additional shareholders would receive. Tsai did not tell the former director shareholders to whom their shares would be transferred. Nor did the 28 additional shareholders know where their shares came from. A number of the new shareholders erroneously thought that their shares came from Tsai.

Tsai admitted that he arranged the transfers "to further the purpose of the company . . . because the purpose of the company is to become publically traded." (10/19/2004 Tsai Dep.

110-11.)  He also admitted that helping the company in this way benefitted him.  Tsai

accomplished the transfers by using blank stock powers which were signed by the former

directors near the time they received their shares.  The blank stock powers were essentially blank

forms which did not include information such as the number of shares that could be transferred

or the name of the company at the time the former director shareholders signed them.

Tsai claims that he discussed the transfer with the former director shareholders before

transferring their shares to the 28 additional shareholders. Stephen Lee testified that he signed

the stock power because Tsai "was a friend and it was something that he needed, so I signed.  I

didn't even–at that time didn't even know what stock power was."  (7/21/2004 Lee Dep. 30.)

Similarly, Carra testified that at the time he signed the blank stock power, he thought he was

being given a power, similarly to a power of attorney, over something.  (7/21/2004 Carra Dep.

23.)  Roberson also testified that he did not understand the stock power when he signed.[5]

(8/28/2000 Roberson Dep. 55.)  Once Tsai had obtained the signed blank stock powers, he was

able to transfer shares out of the names of the former directors without additional documentation.

After the shares were distributed into the hands of the 33 MAS XI shareholders,

Kensington submitted a new list of shareholders to NASD.  On December 13, 1999, "acting in

reliance upon the information contained in the [Form 211] filing," NASD cleared MAS XI for

public trading on the OTCBB.  Tsai testified that after the Form 211 was completed, the shares

held by the MAS XI shareholders became more liquid because they could be traded in a public

marketplace, the OTCBB.  Tsai admits that generally, liquid shares are more valuable than

---

[5]  Roberson explained that he signed the stock power "because [Tsai] was excited about his new
project of the shells.   I wanted to help a friend and I believe that I wasn't doing anything illegal,
and I believe that he was very smart in whatever he was doing."  (*Id.*)

illiquid shares.  To his knowledge, however, most of the MAS XI shareholders were unaware that the Form 211 process had been successfully completed.

*5.  MAS XI's Merger with Bluepoint*

In December of 1999, Bluepoint[6] was looking for a U.S. shell company with which to merge.  Bluepoint was a computer software company that had developed a Chinese version of the Linux operating system.[7]  Around that time, Bluepoint hired Yang as a consultant.  He was tasked with finding an American shell company and facilitating a reverse merger.

Goelo knew Yang from an internet chatroom.  Goelo introduced Yang to Markow who put Yang in contact with Tsai.  Tsai and Bluepoint's CEO negotiated a reverse merger between Bluepoint and MAS XI.  On January 7, 2000, Tsai and Bluepoint's CEO signed a Plan and Agreement of Reorganization, in which they formally agreed to conduct a reverse merger.

Yang, Markow, and Goelo remained involved and in contact during the merger process and in the lead up to public trading.  Markow kept a to-do list and schedule of merger-related tasks that he forwarded to Yang and Goelo.  He also ferried documents between Tsai and Bluepoint's CEO.  Markow contacted Richardson at Sierra and asked Sierra to become Bluepoint's market maker.  Goelo posted information about Bluepoint on online stock trading message boards.  Yang translated Bluepoint's business plan into English.  Tsai reviewed the business plan while deciding whether to agree to the merger.  Markow also reviewed Bluepoint's business plan and discussed it with Goelo.  The business plan described Bluepoint's product, its officers, the risks to the company, and the prospects for financial growth.

---

[6]  Shenzhen Sinx Software Technology Corporation, was later be re-named Bluepoint. It is unclear from the record exactly when the name change occurred, although it appears to have happened before the company merged into MAS XI.

[7]  Linux is an alternative to Microsoft's Windows operating system.

One risk to Bluepoint's future productivity mentioned in the business plan was that, based on the terms of a licensing agreement, Bluepoint was required to publish its source code. This meant that competitors could copy the source code and quickly develop similar products. Thus, Bluepoint's technological advantage could be undermined relatively quickly. The business plan also discussed Bluepoint's projected market share. Yang knew that Bluepoint's total net sales as of the end of 1999 (the last quarter before public trading began) were only $23,027. Markow knew that revenues were "either nonexistent or more extremely minimal." These business risks were never disclosed to the investing public.

     *6. February 2000 Sale of Shares to the Promoter Defendants*

To prepare for the merger, Tsai returned roughly 8.2 million of the shares he held to MAS XI. Those shares were cancelled. The day that the merger was formally approved, MAS XI effected a fifteen-for-one stock split. As a result of the stock split the 250,000 shares held by the 33 MAS XI Shareholders were now 3.75 million shares.

The reverse merger was consummated on February 17, 2000. MAS XI changed its name to Bluepoint as part of the merger process. Following the merger, Bluepoint had 20 million shares of common stock outstanding. Of those shares, 15.5 million were restricted shares which were transferred to the Chinese officers and directors of Bluepoint pursuant to the terms on the Plan and Agreement of Reorganization. Yang was given 500,000 of those restricted shares. Tsai also owned another 450,000 restricted shares. That left approximately 4.5 million "unrestricted" shares outstanding. 3.75 million of those shares were held by the 33 MAS XI shareholders.[8]

According to Tsai, Markow informed Tsai that he had a group of investors that wanted to buy shares from the 33 MAS XI shareholders. (10/19/2004 Tsai Dep. 224.) Tsai arranged to

---

[8] The remaining outstanding shares were held by over 100 foreign individuals in England, Russia, and Venezuela to whom Tsai transferred stock on March 31, 1997.

transfer the 3.75 million shares by the MAS XI shareholders to Markow. On January 7, 2000, Goelo emailed Yang informing him that the purchase price for the shares was $250,000. Yang told Lou.

A few weeks later Goelo, Yang, and Lou wired Markow the $250,000 as follows: $91,250 from Goelo on January 20, 2000; and $79,365 each from Yang and Lou on February 7, 2000. Goelo, Yang, and Lou all testified that the money they sent to Markow was to pay for the purchase of their shares from MAS XI's shareholders. Markow testified that they sent him the money to compensate him for his role in the reverse merger.[9] (3/1/2002 Markow Test. 68-69, 82, 83.) Markow has also testified, however, that he chose to take his remuneration for his role in the reverse merger in the form of a share of the outstanding 4.5 million shares. (12/3/2004 Markow Dep. 103.)

---

[9] Markow testified as follows:

> Q: That was your—your fee?
> A: Yeah.
>
> ***
>
> Q: Who's they?
> A: To—well, to Bluepoint to do this transaction the way—the mechanics of the transaction as I did. For my work, I charged $250,000 . . .
> Q: So that was your charge?
> A: Two hundred and fifty thousand dollars.
> Q: To Bluepoint?
> A: Yes.
> Q: Where did the money come from?
> A: Well it came from certain people. I know part came from Yang. Part came from Goelo, and the other part came from I'm not sure who. It could have been a wire that I received from China. I'm not sure who sent the third wire.
> Q: So the $250,000 is—is a fee for services? It is not money to buy the shares?
> A: It was my objective to buy shares, to take the entire fee and turn it into the shares.

(3/1/2002 Markow Test. 68-69, 82, 83.)

As soon as Markow received the money, he sent a $250,000 check to Tsai. Markow and Tsai claim that the money was a finder's fee paid to Tsai for his role in the reverse merger.[10] After receiving the check, Tsai arranged the sale of shares in the name of the 33 MAS XI shareholders to the Promoter Defendants. First, Tsai issued stock certificates for the stocks issued to the 33 MAS XI shareholders. He then mailed the stock certificates and stock powers to Markow. Markow paid the 33 MAS XI shareholders $100 for their stocks. Each shareholder received the same flat fee payment regardless of whether they sold hundreds or thousands of shares. Consequently, the price paid per share varied from $.07 cents per share to $.67 per share. Several of the shareholders testified that they did not know that they had sold their shares or who Markow was. Markow admits that he never contacted the 33 MAS XI shareholders and did not negotiate with them to arrive at the $100 price. MAS XI did not issue a registration statement before the sale of the shares to the Promoter Defendants.

Shortly thereafter, Markow re-certified the 3.75 million shares in the names of the Promoter Defendants, companies they controlled, and their relatives and friends. On February 22, 2000, Markow directed MAS XI's transfer agent to make the following distribution:

| | |
|---|---|
| Yang | 220,000 Shares |
| K & J Consulting (Yang Controlled) | 450,000 shares |
| Yang's family members | 780,000 shares |
| | |
| Lou | 220,000 shares |
| M & M (Lou Controlled) | 410,000 shares |
| Lou's family members | 370,000 shares |
| | |
| Unikay Ltd. (Goelo controlled) | 375,000 shares |
| Xplorer Inc. (Goelo controlled) | 400,000 shares |
| Goelo's Girlfriend | 200,000 shares |
| | |
| Global Guarantee (Markow controlled) | 325,000 shares |

_____

[10] Markow, however, originally testified that the $250,000 check he sent to Tsai was to pay for shares purchased from the MAS XI shareholders. (3/1/2002 Markow Test. 69-70.)

Yang controlled the 120,000 shares assigned to his mother and deposited them in his company's brokerage account at Sierra. Lou controlled all of the shares assigned to his family members and deposited the 150,000 shares held by his child into his company's account at Sierra. Goelo's girlfriend assigned her shares to Goelo and he deposited them in his Sierra account. In total, the Promoter Defendants deposited 2.43 million of the 3.75 million shares into accounts at Sierra that they controlled.

### 7. The Promoter Defendants' Percentage Ownership in Bluepoint

After the merger, the Promoter Defendants and their family members collectively owned 18.75% of Bluepoint's 20 million shares. The Promoter Defendants themselves held 14.5% (2.9 million shares) of Bluepoint's total shares. Yang alone controlled 5.85% (1.17 million) of the total Bluepoint shares. Similarly, Goelo admits that he alone owned over 5% of the outstanding shares after he bought 40,000 additional shares on March 6, 2000.

The Promoter Defendants never reported their percentage ownership of Bluepoint shares to the SEC. Goelo mentioned his concerns regarding percentage of ownership in a January 5, 2000 email to Markow in which he proposed a new distribution of stock ownership and stated "[t]here is the issue of controlling more than 5% of the stock of the Company to be considered as well and I may have to split the holding amongst two Companies: Unikay Ltd and Xplorer Inc." By March 6, 2000, the Promoter Defendants collectively deposited 2.43 million Bluepoint shares in Sierra brokerage accounts they controlled.

### 8. Public Trading of Bluepoint Shares

On March 6, 2000, Bluepoint began publicly trading on the OTCBB. In the lead up to public trading, Yang, Goelo, and Markow all worked on editing Bluepoint press releases. Markow fronted the money to pay for issuing the press releases.

Prior to public trading, no registration statements had been filed for any MAS XI/Bluepoint shares. Bluepoint's Form 8-K and Schedule 14f-1 were publicly available before the first day of trading. Those forms generally described Bluepoint's business operations and its access to the Chinese Linux market. Yang admits that investors did not have any access to financial information about Bluepoint or information about Bluepoint's business risks.

Once public trading began the Promoter Defendants and Sierra sold Bluepoint shares. Shortly after trading began on March 6, 2000, Sierra bought 100,000 Bluepoint shares from K & J Consulting. Goelo purchased 40,000 of those shares from Sierra. Later that day, Sierra bought additional shares from Yang and Lou. Geiger transacted all of Sierra's trades. Richardson approved Sierra's purchases. He also purchased shares from Sierra and later resold those shares at a profit. Markow sold shares of Bluepoint on March 7, 2000 and August 10, 2000.

Between March 6, 2000 and April 27, 2001 the Promoter Defendants sold their shares in Bluepoint at a profit. Yang sold his shares for $1,195,278. Lou sold his shares for $1,161,869. Markow sold his shares for $1,233,640. Goelo sold his shares for $216,861.

### 9. *Additional Facts Relating to the Market Manipulation Claims*

Only the Defendants have moved for summary judgment on the price manipulation claims (Counts II, III, IV, and VI). Therefore, the facts relating to this claim are viewed in the light most favorable to the SEC, the non-movant.

In the lead up to public trading of Bluepoint's shares, Goelo engaged in an internet touting campaign. In December of 1999 and January of 2000, he posted numerous messages on "Silicon Investor," an online investor message board. In his posts and emails Goelo extolled the virtues of Bluepoint stock, encouraged potential investor to "load up" when trading began, and suggested that they promote the stock to others. Goelo informed Yang and Markow that he was

lining up support on the message boards. Yang instructed Goelo not to post information himself because they had "inside information." After receiving that instruction, Goelo requested that two of his friends post positive information about Bluepoint online. They did so, posting dozens of positive posts on the Silicon Investor and "Raging Bull" sites during March of 2000, while trading was beginning. There is evidence suggesting that Markow and Goelo compensated one of those positive posters, defendant Armstrong, for his activities.[11]

OTCBB trading of Bluepoint stock began on March 6, 2000. That morning the price of Bluepoint shares shot up from an initial price of $6.00 per share to a peak of $21.00 per share less than an hour later. Sierra was a market-maker[12] for Bluepoint. Geiger conducted Sierra's market making activities on the first day of trading under Richardson's supervision.

A review of the trading activity on March 6, 2000 shows that Sierra was heavily involved in trading Bluepoint. From the first Bluepoint trade at 9:42 a.m. until 10:59 a.m., Sierra held the "inside bid" (the highest bid quote) for 69% of the time, while the next most active market maker held the inside bid for only 20% of the time. Similarly, as Bluepoint's price rose from $6.02 to $19.50, Sierra accounted for 80% of the trading activity. During that time, Sierra raised its bid seven times to become the inside bid.

The Promoter Defendants were also involved in trading on March 6, 2000. In fact, within the first eleven minutes of trading Defendants Yang, Goelo, Lou, and Sierra repeatedly traded with one another, twice in pre-arranged sales. Specifically, in the first trade of the day Yang sold Sierra 100,000 shares of Bluepoint for $6.00 per share. Immediately thereafter, Geiger sold

---

[11] The Defendants' deny this.

[12] A "market maker" on the OTCBB holds himself out "as being willing to buy and sell [a] security for his own account on a regular or continuous basis." *SEC v. Martino*, 255 F.Supp.2d 268, 276 n.15 (S.D.N.Y. 2003) (internal quotation marks omitted). Market makers post the prices at which they are prepared to buy (bid) and sell (ask) a particular security. *Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 259 F.3d 154, 169 (3d Cir. 2001)

40,000 of those shares back to Goelo for $6.02 per share. Goelo bought the additional shares from Sierra even though he already owned 975,000 Bluepoint shares which he has acquired for $0.09 per share during the reverse merger. Furthermore, Yang, Goelo, and Geiger had pre-arranged those two sales as well as the price per share before the first day of trading.

A few minutes after the Yang-Sierra-Goelo sales, Sierra bought an additional 100,000 shares from Yang and Lou (50,000 shares each from K & J Consulting, Yang's company, and M & M, Lou's company). Sixteen minutes after the first trade, a customer named Kim Giffoni ("Giffoni") purchased 5,000 shares from Sierra at $7.1875 per share. Giffoni testified that Markow suggested that he make the purchase and arranged the transaction, including the price at which Sierra would sell the shares, before the first day of trading. Markow also asked Giffoni not to sell his shares during the first day of trading and offered him a financial incentive to comply with his request.

At the time that the Promoter Defendants engaged in those transactions they controlled over 80% of the tradable Bluepoint shares (the "float"). They had also failed to register Bluepoint's stock, which meant that very little public information was available about the company. For example, the investing public had not been informed of the business risks contained in Bluepoint's business plan. Similarly, the Promoter Defendants had not disclosed their beneficial ownership of a substantial percentage of Bluepoint's stock, so the investing public did not know who owned Bluepoint or that one of the main owners, Markow, was a repeated securities law violator.

Sierra's trading of Bluepoint shares on the morning of March 6, 2000 was irregular in several ways. Sierra's first purchase of a single block of 100,000 shares from Yang was reported to NASD as four purchases, giving the appearance of more market activity than had actually

occurred.  Sierra also took an unusual "long" position in Bluepoint shares at the beginning of its first day of trading, meaning that it built up a large inventory of Bluepoint shares.  In the first eleven minutes of trading, Sierra bought 200,000 shares of Bluepoint, investing $700,000.  Geiger and Richardson also agreed to buy the first 100,000 shares from Yang for $6.00 even though they had not performed any market analysis before agreeing to that price.  Instead, Geiger merely accepted the price suggested by Yang.

Yang has testified that he, Markow, and Goelo were all concerned with maintaining the price of the Bluepoint shares. He admitted that it was important to everybody that the price be set and remain above four or five dollars a share (the threshold for penny stock status) because many investors will not buy and sell penny stocks.  Finally, the evidence shows that Sierra increased its inside bid[13] while it was already long on Bluepoint and immediately after it had purchased 100,000 shares.  According to Arthur J. Pacheco ("Pacheco"), the SEC's expert witness, there is "no legitimate reason for a market maker to increase its own inside bid immediately after the purchase of 100,000 shares unless its purpose was to move the price of the stock up."  (Pacheco Dec. ¶7.)

### B.  Procedural History

On April 11, 2003 the SEC filed a complaint against Tsai, Markow, Yang, Goelo, Lou, Geiger, Richardson, Sierra, Global Guarantee, K & J Consulting, M & M, and Armstrong for violations of the federal securities law.  On September 2, 2004, the SEC moved for a declaration that Tsai's attorney-client privilege and confidentiality had been waived under the crime-fraud exception.  The parties extensively briefed the motion ("crime-fraud briefing") and on October 4, 2004, the Court heard oral arguments on the motion.  Magistrate Judge Abel granted the SEC's motion in February of 2005.

---

[13]  An "inside bid" is the highest bid at the time.

On July 20, 2005 the SEC and the moving defendants filed their motions for summary judgment. The SEC seeks partial summary judgment on Counts I (registration claim), VIII and IX (disclosure of beneficial ownership claims) of the Complaint. It also asks the Court to:

(1) Permanently enjoin Tsai, Markow, Global Guarantee, Yang, K & J Consulting, Lou, M & M, Goelo and Richardson from violating Section 5 of the Securities Act;

(2) Permanently enjoin Tsai, Markow, Global Guarantee, Yang, K & J Consulting, Lou, M & M, and Goelo from violating Sections 13(d)(1) and 16(a) of the Exchange Act and Rules 13d-1(a) and 16a-3;

(3) Permanently enjoin Markow, Global Guarantee, Yang, K & J Consulting, Lou, M & M, and Goelo from violating Section 13(d)(2) of the Exchange Act and Rule 13d-2(a);

(4) Order Tsai, Markow, Global Guarantee, Yang, K & J Consulting, Lou, M & M, and Goelo, Sierra, and Richardson to disgorge all of the profits they received from their alleged securities violations as well as prejudgment interest.

The SEC seeks trial on all other claims.

The moving Defendants cross-motioned for summary judgment on Counts I, VIII, and IX. They also seek summary judgment on the price manipulation claims (Counts II, III, IV, and VI). Defendants Richardson and Sierra did not join the other defendants' summary judgment motion and did not file their own. Moreover, although Defendant Richardson requested (doc. no. 140) and ultimately received (doc. no. 193) additional time to file an opposition to the SEC's motion for summary judgment, he never did so. Defendant Sierra also failed to oppose the SEC's motion for partial summary judgment.

During the pendency of the Parties' motions for summary judgment several things occurred which are relevant to the resolution of the motions. First, final judgment was entered

against defendant Jerome Armstrong on July 25, 2007. (Doc. no. 202). Armstrong consented to the entry of final judgment without admitting or denying the allegations of the complaint. Second, Defendant Global Guarantee failed to comply with the Court's January 7, 2008 and March 17, 2008 Orders and the Court entered a default against it on February 27, 2009. Therefore, Global Guarantee's liability is no longer in dispute. Third, on March 26, 2009, Defendant Richardson consented to the entry of final judgment against him without admitting or denying the allegations in the Complaint. The Consent was filed with the Court on March 30, 2009. (Doc. no. 216). In the Consent, Richardson agreed to the imposition of a permanent injunction against him. Consequently, Richardson's liability will not be determined by the Court in its resolution of the parties' motions for summary judgment. Finally, on March 31, 2009, the Court ordered an entry of default against Sierra pursuant to Federal Rule of Civil Procedure 55(a), with the amount of the default judgment to be determined by a future order. As a result, Sierra's liability will not be discussed in or determined by this Order.

On May 25, 2007 the Court granted the SEC's motion for leave to file supplemental legal authorities in support of its motion for summary judgment. On May 23, 2008 the SEC again moved for leave to file supplemental legal authority in support of its motion for summary judgment motion. (Doc. no. 208). That motion is **GRANTED**.

### III. STANDARD OF REVIEW

Summary judgment is proper if "there is no genuine issue as to any material fact [and] the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). But "summary judgment will not lie if the . . . evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In considering a motion for summary judgment, a court must construe the evidence in the light most

favorable to the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The movant therefore has the burden of establishing that there is no genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Barnhart v. Pickrel*, *Schaeffer & Ebeling Co.*, 12 F.3d 1382, 1388-89 (6th Cir. 1993). The central inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251-52. When ruling on a motion for summary judgment, a district court is not required to sift through the entire record to drum up facts that might support the nonmoving party's claim. *InterRoyal Corp. v. Sponseller*, 889 F.2d 108, 111 (6th Cir. 1989). Instead, a court may rely on the evidence called to its attention by the parties. *Id.* The standard of review for cross-motions of summary judgment does not differ from the standard applied when a motion is filed by only one party to the litigation. *Taft Broad. Co. v. U.S.*, 929 F.2d 240, 248 (6th Cir. 1991). Furthermore,

> [t]he fact that both parties have moved for summary judgment does not mean that the court must grant judgment as a matter of law for one side or the other; summary judgment in favor of either party is not proper if disputes remain as to material facts. Rather, the court must evaluate each party's motion on its own merits . . . .

*Id.* (citations omitted).

## IV. LAW & ANALYSIS

### A. Section 5 Registration Provision Claims

The SEC and the Defendants have cross-motioned for summary judgment on the SEC's registration violation claims. Under Sections 5(a) and 5(c) of the Securities Act, securities must be registered with the SEC before any person may sell or offer those securities. 15 U.S.C. §

77e(a) & (c).[14]  The purpose of the registration requirement is to "provide adequate disclosure to members of the investing public."  *SEC v. Harwyn Indus. Corp*., 326 F.Supp. 943, 954 (S.D.N.Y. 1971).  To establish a prima facie violation of Section 5, the SEC must prove that: (1) no registration statement was in effect for the securities; (2) that the defendant directly or indirectly sold or offered to sell the securities; and (3) that means of interstate transportation or communication were used in connection with the offer or sale.  *Eur. & Oversees Commodity Traders, S.A. v. Banque Paribas London*, 147 F.3d 118, 124 n. 4 (2d Cir. 1998).  Scienter is not an element of a Section 5 violation because Section 5 imposes strict liability on sellers of securities.  *SEC v. Calvo*, 378 F.3d 1211, 1215 (11th Cir. 2004); *Swenson v. Engelstad*, 626 F.2d 421, 424 (5th Cir. 1980) (the Securities Act imposes strict liability on offerors and sellers of unregistered securities); *SEC v. Cavanagh*, 1 F.Supp.2d 337, 361 (S.D.N.Y. 1998) (hereinafter *Cavanagh I*) (to prove a violation of Section 5, a plaintiff need not establish scienter).

---

[14] Section 5(a) states:
Unless a registration statement is in effect as to a security, it shall be unlawful for any person directly or indirectly—
>    (1) to make use of any means or instruments of transportation or communication in interstate commerce or the mails to sell such security through the use or medium of any prospectus or otherwise; or
>    (2) to carry or cause to be carried through the mails or in interstate commerce, by any means or instruments of transportation, any such security for the purpose of sale or delivery after sale.

15 U.S.C. § 77e(a).
Section 5(c) states in pertinent part:
>    It shall be unlawful for any person, directly or indirectly, to make use of any means or instruments of transportation or communication in interstate commerce or of the mails to offer to sell or offer to buy through the use or medium of any prospectus or otherwise any security, unless a registration statement has been filed as to such security . . . .

15 U.S.C. § 77e(c).

A defendant is liable as a seller under Section 5 if he was a "necessary participant" or "substantial factor" in the illicit sale.[15]  *See, e.g., SEC v. Calvo*, 378 F.3d 1211, 1215 (11th Cir. 2004); *SEC v. Holschuh*, 694 F.2d 130, 139-40 (7th Cir. 1982).  Thus, even if a defendant did not directly sell securities to investors himself or pass title, he is liable for registration violations if he "has conceived of and planned the scheme by which the unregistered securities were offered or sold."  *SEC v. Friendly Power Co.*, 49 F.Supp.2d 1363, 1371 (S.D. Fla. 1999); *see also Pinter v. Dahl*, 486 U.S. 622, 647 (1988).  If the plaintiff is able to make out a prima facie case, the defendant bears the burden of showing that the challenged securities transactions fall within one of the enumerated exemptions from registration.  *SEC v. Ralston Purina Co.*, 346 U.S. 119, 126 (1953); *SEC v. Cavanagh*, 155 F.3d 129, 133 (2d Cir. 1998) (hereinafter *Cavanagh II*).

The SEC claims that Tsai, the Promoter Defendants, Sierra, and Richardson violated Section 5.  The SEC claims that each of the following unregistered transfers violated Section 5: (1) Tsai's transfer of shares to the five former directors in 1997; (2) the August 1999 transfer of shares to the 28 additional shareholders arranged by Tsai; (3) the sale of 3.75 million MAS XI shares to the Promoter Defendants arranged by Tsai and Markow; (4) the Promoter Defendants' post-merger sale of shares on the OTCBB; (5) Sierra's post-merger sales of shares on the OTCBB; and (6) Richardson's post-merger sale of shares on the OTCBB.  The SEC also argues that Markow, Yang, and Goelo violated Section 5(c), by offering to sell unregistered Bluepoint securities by editing and distributing press releases announcing the March 6, 2000 public trading

---

[15]  Defendants incorrectly argue that "necessary participant" and "substantial factor" liability was abolished by the Supreme Court's ruling in *Pinter v. Dahl*, 486, U.S. 622 (1988), which rejected such liability in private claims under Section 12 of Securities Act.  Courts who have considered the issue, however, have confirmed that necessary participant and substantial factor liability in Section 5 cases survives the *Pinter* ruling.  *See, e.g., SEC v. Phan*, 500 F.3d 895, 906 n.13 (9th Cir. 2007) (Section 5 liability based on a defendants role as a necessary participant or a substantial factor in the sales transaction survives the survives the Supreme Court's ruling in *Pinter v. Dahl*, 486, U.S. 622 (1988));  *Geiger v. SEC*, 363 F.3d 481, 488 (D.C. Cir. 2004) (same).

of Bluepoint.  They further argue that Goelo offered to sell by posting messages on internet message boards designed to stimulate investor interest.

The Parties do not dispute that no registration statements were filed or were in the process of being filed at the time of those stock transfers or press releases.  The Defendants counter, however, that: (1) the SEC has not established a prima facie case regarding Tsai's January 1997 and February 1999 "gift" transfers; (2) the 1997 and 1999 gift transfers and the February 2000 sales were exempt from registration under Rule 144(K); (3) sales of Bluepoint stock by the Promoter Defendants are exempt under Section 4(1); and (4) the SEC cannot rely on a non-fraud theory of liability because the registration violations alleged in the Complaint are based on fraud.

*1.  Section 5 Prima Facie Case*

Turning to the SEC's prima facie case, it is undisputed that none of the securities sold by the Defendants were registered.  The Defendants only attack the SEC's prima facie showing regarding Tsai's 1997 transfer to the five former director shareholders and his 1999 transfer to the 28 additional shareholders.  With regard to the sales prong, the Defendants argue that Tsai's 1997 and 1999 transfers to the MAS XI shareholders were gifts, not sales. In support, they point out that Tsai received no compensation from the former directors or 28 additional shareholders, but gave the shares away for free.  With regard to the interstate means/use of the mails prong they argue that the SEC has not proved this element for the 1997 transfer.

Every "disposition of a security or interest in a security, for value" constitutes a sale.  15 U.S.C. § 77b(a)(3).  The value flowing from a transfer, however, need not come from the immediate recipient of the stock.  *Harwyn,* 326 F.Supp. at 954 (transfer in the form of a dividend was for value even though stockholders paid nothing for the shares).  The analysis of whether

value was received must consider the entire transaction.  *In the Matter of Capital General Corp.*, Release Nos. 33-7008, 34-32669, 1993 WL 285801, at *11 (July 23, 1993); *SEC v. Datronics Engineers, Inc.*, 490 F.2d 250, 253 (4th Cir. 1973).

Defendants are correct that a bona fide gift of a security would not constitute a sale.  *See Shaw v. Dreyfus*, 172 F.2d 140, 142 (2d Cir. 1949) (transfers were not sales under Section 16(b) of the Exchange Act where the parties conceded they were bona fide gifts).  But, where the "donor" of a security derives some real benefit from the purported "gift," it will be treated as a sale.  2 Thomas Lee Hazen, *Law of Securities Regulation*, §5.1 (6th ed. 2009).  Thus, where a "gift" disperses corporate ownership and thereby helps to create a public trading market it is treated as a sale.[16]  *Datronics*, 490 F.2d at 253-54; *Capital General*, 1993 WL 285801, at *10

---

[16]  The Defendants contend that the line of cases finding value when gratis transfers subsequently lead to the creation of a public trading market is distinguishable.  They claim that the theory of "value" in those cases does not apply where the "disposition of shares of a closely-held corporation did not quickly or immediately produce a public market that added value to the shares."  (Defs.' S.J. Reply 23.)  The Court finds this distinction unpersuasive for several reasons.  First, as a factual matter, not all of these cases involved the immediate creation of a public market following the purported gift of securities.  *Capital General*, 1993 WL 285801, at *5.  Second, the relevant question derived from these cases is not how quickly the purported gift resulted in a public trading market, but whether the gift was part of a plan which would result in public trading of unregistered stock.  *See Harwyn*, 326 F.Supp. at 954 ("the chain of events must be viewed as a whole, just as it was by the parties when they undertook the spin-off ventures"); *Datronics*, 490 F.2d at 254 (holding that the "spurious creation of a market [through a stock spin-off] whether intentional or incidental constituted a breach of the securities statutes" because "in subsequent sales the investing public was not afforded the protection intended by the statutes").  Third, the courts have explained that the registration provisions are "designed as to prevent any circumvention of the registration requirement by devious and sundry means."  *Harwyn*, 326 F.Supp. at 954.  They have further cautioned against "engage[ing] in strangulating literalism" when interpreting the act.  *Id*.  In this case, Tsai intended to trade MAS XI publicly and to court a reverse merger at the time he gifted the shares.  He continued to work actively to reach that goal between the time he gifted the shares, the time the merger was consummated, and the time public trading began on the OTCBB.  Allowing Tsai to side-step the registration requirement merely because his plan to trade MAS XI publicly without registration took time to achieve would ignore the fundamental purpose of the registration requirements.  *Id*. at 952 ("the registration provisions are designed not only to protect immediate recipients . . . but also subsequent purchasers").  Fourth, the case relied on by the Defendants, *Rathborne v. Rathborn*e, 508, F.Supp. 515, 518 (E.D. La. 1980), is distinguishable.  In *Rathborne*, the plaintiff claimed that

(Capital General's distributions of securities in a shell company were a sale in violation of Section 5 because value accrued to the defendants "by virtue of the creation of a public market for the issuers securities, and the fact that, as a public company the issuer could be sold for greater consideration). In other words, where a gift is "followed by widespread downstream sales of those securities, these would-be gifts may be characterized as a subterfuge to evade registration." *Id*.; *accord Harwyn*, 326 F.Supp. at 954 (payment of a stock dividend without registration violated section 5 because the purpose of the stock spin-off was to create a public market for the securities without registration); 24 William M. Prifti, *Securities: Public & Private Offerings*, § 9.18 (2008) (if gifted securities "are intended for the creation of a public market, the gifting clearly constitutes a disposition for value and the sale of a security").

In this case, Tsai admits that he created MAS XI, like his other 100 shell companies, for the express purpose of merging them with a private company. To do so, he needed to make MAS XI a public company. He also admits that he gifted shares to the former directors in 1997, "because we need [sic] shareholders so we can try to take the company public later on." (3/25/2002 Tsai Test. 30.)

Similarly, the 1999 gifts to the additional 28 shareholders were arranged by Tsai to further his goal of taking MAS XI public. The gifts were spurred by his attempts to get MAS XI cleared for trading on the OTCBB by completing the required Form 211. The undisputed record evidence shows that Tsai arranged the August 1999 gifts in response to the July 26, 1999 letter he received from NASD, which explained that MAS XI's Form 211 application was deficient

---

defendants violated Section 10(b) of the Exchange Act when they issued a stock dividend in a closely-held family corporation. *Id*. at 516. The *Rathborne* Court held that the dividend was not a sale in this context because closely-held family corporations "will generally not produce a public market." *Id*. at 518. Conversely, shell companies like MAS XI exists only to serve as a vehicle to allow another company to create a public market cheaply.

because its shares were concentrated in the hands of only five shareholders. (10/19/2004 Tsai Dep. 105.)

To remedy this, Tsai admits that he arranged for the the five former directors to transfer shares to the additional 28 shareholders. Those transfers were made without the five former shareholders knowledge of how many shares they would be "gifting" or to whom they were transferring their shares.[17] Likewise, the 28 additional shareholders did not know where the shares were coming from and assumed it was from Tsai. Moreover, Tsai admits that both the 1997 and 1999 transfers were designed to further the MAS XI's purpose "because the purpose of the company is to become publically traded." (*Id*. 110-11.) He also admits that helping the company in this way benefitted him personally. Shortly after receiving notice of the additional shareholders, NASD cleared MAS XI for public trading on the OTCBB. Tsai retained an interest in MAS XI after the transfers. He also admits that he was ultimately paid a $250,000 fee for his role in the reverse merger with Bluepoint.

Under these circumstances, Tsai's purported "gifts" were for value and constituted sales under Section 5. *Capital General*, dealt with a nearly identical scenario. 1993 WL 285801, at *5, 10-11. In that case, a defendant named Yeaman was sanctioned for, *inter alia*, Section 5

---

[17] For example "former director" shareholder Lee testified as follows:
   Q: Did you ever transfer your shares of MAS Acquisition XI?
   A: I didn't do anything. There was no interaction whatsoever, so the answer is no.
   Q: Did you transfer 7500 shares of MAS Acquisition XI to Tzoo Jy Pan on August 5th of 1999?
   A: I don't even know that person.
                                   ***
   Q: Did you ever gift any shares of MAS Acquisition XI?
   A: No.
   Q: Did you ever sell any shares of MAS Acquisition XI?
   A: No. Whatever I got is there. This is it.
(4/30/2004 Lee Dep. 31-32, 33.) Other former director shareholders testified similarly.

violations arising from his plan to create public companies without registration and to later transfer control of those companies to promoters or privately held companies for a fee. *Id*. at *5.

Like Tsai, Yeaman and his company created 69 shell companies over the course of several years. *Id*. He distributed shares of those companies to hundreds of people as "gifts" without filing registration statements. *Id*. After the gifts, Yeaman, like Tsai, kept a controlling interest in the shell companies. *Id*. He then advertised that his company had publicly-held issuers available for mergers and successfully transferred control of 36 of the shells to issuers or private companies. *Id*. For his efforts, he received over $750,000 in fees. *Id*. After the transfers of control, Yeaman retained stock in the companies and helped them prepare NASD filings so that they could be publicly traded on the OTCBB. *Id*.

The SEC held that the unregistered "gifts" of stock constituted sales and violated Section 5. The SEC explained that ". . . the fact that the recipients may not have provided direct monetary consideration for the shares does not mean that there was not a sale or offer for sale for the purposes of Section 5." *Id*. at *10. The SEC concluded that the shares were not distributed for a charitable purpose but so that Yeaman could sell control of the shell companies for significant value. *Id*. at *11. The SEC reasoned that the distributions were for value because "after the stocks were gifted, [their value] increased due to the creation of a public trading market for the securities." *Id*. That increased value would flow to Yeaman both because he retained a controlling interest in the shells after the transfer and because he was compensated when he ultimately found buyers for the shells. *Id*.

Like the defendant in Capital General, Tsai transferred shares as gifts as part of a plan to take his shell company public and transfer control of the company for a greater value. Defendants themselves argue that the MAS XI shares had little to no value before the Bluepoint

merger.[18]  The transfers were necessary to clear the company for public trading on NASD, which in turn made the company a more attractive candidate for a reverse merger.  Thus, Tsai's 1997 and 1999 "gift" transfers were for value because they helped to create a public market in the securities.  Tsai benefited from this because it increased the value of the shares he held in MAS XI and because it allowed him to collect a $250,000 fee in connection with the merger.  Consequently, the "gifts" were sales triggering the Section 5 registration requirement.

With respect only to the 1997 gift of shares to the five former directors, Defendants argue that the SEC has not shown that interstate means were used.  The use of the mails or interstate means element of  a Section 5 claim is "broadly construed to include tangential mailings or intrastate telephone calls."  *SEC v. Softpoint, Inc.*, 958 F.Supp. 846, 861 (S.D.N.Y. 1997).  With relation to the 1997 sale, the SEC has provided evidence that one of the five former director shareholders, Stephen Lee, was living in New York at the time of the 1997 transfer and that he received his MAS XI stock certificates (including a certificate for the 1997 transfer) by mail while he was living in California.  (4/30/2004 Lee Dep. 20-21, 25-26; 8/25/2000 Lee Test. 45-48).  Upon receiving the stock certificates, Lee testified that he called Tsai to ask what they were. Lee also testified at his deposition, that while he was living in California he signed his blank stock power and mailed it to Tsai.  (4/30/2004 Lee Dep. 29-31.)  Although these mailings occurred after the 1997 transfer, they are sufficient to satisfy the interstate means/use of the mails

---

[18]  They argue that the fact that the shares had little value until the time of the merger and that the prospect of the merger was speculative at the time of the transfers demonstrates that the transfers were indeed gifts.  Quite the opposite is true; the fact that the shares were valueless and the merger speculative in fact provided a motive to engage in the transfers. Tsai's shares would only have value after a merger, and a merger could not take place until the company had secured public trading status.  That status could only be secured once transfers had created a less concentrated shareholder base. Thus, as in *Capital General* where the success of a merger was similarly speculative at the time of the "gift," Tsai benefitted from the transfers by controlling a shell company that was afterwards a more attractive merger candidate.  In other words, the "gifts" were for value because they increased the odds that Tsai could make some profit out of MAS XI.

requirement of Section 5.  *United States v. Wolfson*, 405 F.2d 779, 784 (2d Cir. 1968) (interpreting Section 5 to prohibit use of the mails to ship securities certificates after sale, to remit the proceeds to the seller, to send stock offers, to send buyers' confirmation slips and to cover even more tangential uses); *see also Aquionics Acceptance Corp. v. Kollar*, 503 F.2d 1225, 1228-29 (6th Cir. 1974) (use of the mails to transport a stock certificate months after a sale is sufficient to satisfy interstate requirement of Section 10b-5); *Nicewarner v. Bleavins*, 244 F.Supp. 261, 265 (D. Colo. 1965) (one post-transfer Chicago to Denver telephone call regarding an error in the transfer and one post-transfer letter about the same problem were sufficient to establish use of interstate means or of the mails).  Furthermore, the Court notes that it is undisputed that Tsai's 1999 sale to the additional 28 shareholders and his 2000 sales of Bluepoint shares on the OTCBB involved interstate means.  Thus, even if the 1997 sale did not involve interstate means, as the Court believes it did, the SEC has established a prima facie case of a Section 5 claim based on his other transfers.

As the SEC has established all the elements of its Section 5 prima facie case, the Defendants must prove that they qualify for an exemption from the registration requirement to avoid liability.

### 2.  Applicability of Exemptions 4(1) and Rule 144(k)

Defendants argue that they are entitled to summary judgment because their unregistered sales of securities fit into exemptions 4(1) and Rule 144(k) to the registration requirement.  The Securities Act contains several enumerated exceptions to the registration requirement.  The Defendants bear the burden of establishing their transfers fall within one of the enumerated exemptions from registration.  *Ralston Purina Co.*, 346 U.S. at 126; *Cavanagh II*, 155 F.3d at 133.  "Registration exemptions are construed strictly to promote full disclosure of information

for the protection of the investing public." *SEC v. Cavanagh*, 445 F.3d 105, 115 (2d Cir. 2006) (hereinafter *Cavanagh IV*).

Section 4(1) of the Securities Act exempts "transactions by any person other than an issuer, underwriter, or dealer" from Section 5's registration requirement. 15 U.S.C. § 77d(1). To clarify the definition of the term "underwriter" the SEC drafted Rule 144. The Rule creates a "safe harbor" by limiting the definition of the term to exclude those who meet the requirements of the Rule. *SEC v. M & A West Inc.*, 538 F.3d 1043, 1050 (9th Cir. 2008). Rule 144(k) on which Defendants rely, creates a "safe harbor" for unregister sales of restricted securities if: (1) the seller has not been an affiliate of the issuer for the preceding three months, and (2) at least two years have elapsed since the securities were last acquired from an issuer or affiliate of the issuer.[19] 17 C.F.R. § 230.144(k). A defendant who does not satisfy the requirements of Rule 144 can still avoid liability if he does not meet the statutory definition of an underwriter. *SEC v. Kern*, 425 F.3d 143, 148 (2d Cir. 2005). Conversely, a person who satisfies Rule 144 must still demonstrate that he is neither an issuer nor a dealer to qualify for the 4(1) exemption. *Id.*

Defendants argue that the February 2000 sale of the MAS XI shareholders shares to the Promoter Defendants was exempt under Rule 144(k). They also claim that Tsai's 1997 and 1999 sales and the Promoter Defendants' sales of shares to the public are exempt from registration under Section 4(1) of the Securities act. The SEC contends that no exemptions apply to the sales and that it is entitled to summary judgment on the Section 5 violations.

### a. Rule 144(k) Safe Harbor

The Rule 144(K) requires both (1) that a person wait 90 days after ceasing to be an affiliate before selling securities, and (2) that two years have elapsed between the time the

---

[19] Rule 144(k) has been repealed and replaced by Rule 144(b), which changed the two-year holding period in effect at the time of the actions that form the basis of the case *sub judice*, with a one-year holding period. *M & A West, Inc.*, 538 F.3d at 1046 n.1.

securities were acquired from an affiliate or issuer and when they are resold. An affiliate is "a person that directly, or indirectly . . . controls, or is controlled by, *or is under common control with [the] issuer*." 17 C.F.R. § 230.144(a)(1) (emphasis added). Under that definition, shareholders who are controlled by the same person that controls the issuer are affiliates. *SEC v. Kern*, 425 F.3d 143, 149 (2d Cir. 2005). In early February 2000, the Promoter Defendants bought their shares from the 33 MAS XI Shareholders and resold them less than a month later when public trading of Bluepoint shares began. The shareholders acquired their shares from Tsai in 1997 (for the five former director shareholders) and from the existing shareholders at Tsai's direction in 1999 (for the additional 28 shareholders). The Defendants concede that Tsai was an affiliate of MAS XI, the issuer. Thus, the Defendants can only rely on Rule 144(k)'s safe harbor if the MAS XI Shareholders were not affiliates and held their shares for two years.

The Promoter Defendants argue that the MAS XI shareholders were not affiliates because they did not have the power to cause MAS XI to prepare and file a registration statement. The SEC counters that Tsai exerted sufficient control over the MAS XI shareholders to render them affiliates. In *SEC v. Kern,* the Second Circuit analyzed whether shareholders were affiliates in a business transaction similar to the case *sub judice*. 425 F.3d at 149.

Three of the *Kern* defendants were in the business of creating shell companies. *Id*. at 146. Those defendants purchased or incorporated three shell companies, which were the subject of the suit. *Id*. They distributed stock in each company as gifts to their friends and family. The shareholders were not involved in any of the shell companies' decision-making, even though several of the share holders supposedly served as corporate officers. *Id*. Instead, the defendants controlled the shell companies and made business decisions.

After the shares were gifted, the defendants submitted Form 211 filings to get the shell companies registered on the OTCBB.  *SEC v. Lybrand*, 200 F.Supp.2d 384, 387 (S.D.N.Y. 2002), *aff'd sub nom. SEC v. Kern*, 425 F.3d 143, 149 (2d Cir. 2005).  They then sought buyers for the corporations.  *Id.*  After finding a buyer, "defendants would gather the corporation's shares from their friends and associates, who in most cases had held the shares for more than two years, and transfer ownership of the company in exchange for an agreed purchase price."  *Id.* The defendants bought the shares from the shareholders in cash at undocumented prices set by the defendants.  *Kern*, 425 F.3d at 146.  The reacquired shares were later sold in what amounted to a reverse merger effected through public sales of the shell companies' securities to another defendant and his clients.  *Id.*

The defendants argued that their unregistered sales were exempt under Rule 144(k).  *Id.* at 148.  The Court held that the defendants could not rely on Rule 144(k) because the friend and family shareholders were affiliates under the Rule.  *Id.* at 150.  The Court explained that the shareholders were affiliates because they were "under common control with" the shell company issuers, i.e., the defendants controlled both the shell companies and the shareholders.  *Id.* at 149. The Court reasoned that the defendants controlled the issuer shell companies because they orchestrated the merger, had the power to distribute stock, served as corporate officers, and ignored corporate formalities.  *Id.*  They also controlled the shareholders because they were able to gather more than 90% of the shell companies' stock from the shareholders at a fraction of the price at which it was sold to the other defendant in the merger proceeding.  *Id.* at 150.

Similarly, in this case, the Court finds that the Promoter Defendants do not satisfy the requirements of Rule 144(k) because the MAS XI Shareholders from whom they bought their shares were affiliates of MAS XI.  The Court has little difficulty finding that Tsai controlled

MAS XI.  Tsai admits that he was an affiliate of the issuer, MAS XI.  He also admits that he

"owned more than 95% of the shares of MAS XI and was the president and director who

conducted the affairs of [MAS XI]."  (Defs.' Reply, 25.)  Like the defendants in *Kern*, Tsai

orchestrated the negotiations between MAS XI and Bluepoint that lead to the merger, he had and

exercised the power to distribute stock, he served as a corporate officer, and he ignored corporate

formalities, including repeatedly violating corporate bylaws.[20]

The Court also finds that Tsai controlled the MAS XI shareholders.  Rule 144 does not

define the term control, but the parties do not dispute that the Court may look to Rule 405 for an

appropriate definition.  "Control" is broadly defined in Rule 405 as "the possession, direct or

indirect, of the power to direct or cause the direction of the management and policies of a person,

whether through the ownership of voting securities, by contract, or otherwise."  17 C.F.R. §

230.405.  The undisputed record evidence shows Tsai's influence over the MAS XI shareholders

amply satisfies that standard.  Like the *Kern* shareholders, the MAS XI shareholders, including

the five "former directors," had no role in corporate decision-making.  Tsai admits that the

"shareholders" did not attend shareholder meetings or participate in electing corporate officers.

The record shows that the shareholders were largely unaware of the nature and extent of their

ownership; their director roles, if any with the company; to whom and how many of their shares

were transferred; that their shares were cleared for public trading; and the occurrence of the

reverse merger.

---

[20] Tsai violated the bylaw in several ways.  First, he was the only director at the time the bylaws
became effective, even though the bylaws required three directors.  Second, he never held a
shareholder meeting with the MAS XI shareholders.  Instead, he held shareholder meetings and
elected directors by himself without sending notices of the meetings or obtaining the written
consent of the shareholders as required by the bylaws.  Third, he did not issue stock certificates
at the time he distributed stocks to the shareholders in 1997 and 1998 as required by the bylaws,
but only much later in preparation for the reverse merger in 2000.

Tsai exercised his control over the shareholders repeatedly. In 1999, he orchestrated the transfer of the majority of the shares held by the five former director shareholders to an additional 28 shareholders without any compensation to the existing shareholders or their knowledge of the transfer. Tsai admitted that he determined how many of the five former director's shares he would transfer on an arbitrary basis. In 2000, he arranged the transfer of all of the 33 MAS XI shareholders' shares to the Promoter Defendants for a flat fee of $100 regardless of how many shares they sold. The Defendants argue that the fact that the MAS XI shareholders were paid for their shares supports their argument that Rule 144(k) applies. The *Kern* shareholders, however, were also compensated for their stock. *Id*. at 146.

Tsai controlled the disposition of the shareholders' shares via blank stock powers which had been signed by the shareholders years before. The Defendants claim that the fact that the shareholders signed the blank stock powers authorized Tsai to transfer their shares in connection with a reverse merger and defeats the SEC's control argument. When asked at their depositions, however, shareholders testified that they did not understand what the stock powers were when they signed them and that the stock powers were completely blank (including lacking a company name) when they were signed. Moreover, the fact that the shareholders may have agreed, however unwittingly, to have their shares controlled by Tsai does not alter the fact that he exerted control over their shares. Finally, as in *Kern*, there is proof that Tsai controlled the MAS XI Shareholders because he was able to arrange the transfer of all of their shares to the Promoter Defendants at a fraction of the price at which they were sold on the OTCBB and to the Promoter Defendants.[21]

_____

[21] The 33 MAS XI shareholders received $100 each for their shares (per share payment varied between $0.07 and $0.67), a total of $3,000. Yang, Goelo, and Lou testified that they sent $250,000 to Markow to pay for those shares. Markow alone disputes this and claims the $250,000 was a payment for his services in the reverse merger. He also testified, however, that

This Court concludes that Tsai controlled MAS XI and the MAS XI Shareholders. Consequently, the MAS XI Shareholders were "under common control with" the issuer and were affiliates, so Rule 144(k) does not apply. The Defendants advance several arguments to avoid this conclusion, none of them compelling.

First, Defendants attempt to distinguish the facts in *Kern*. Tsai points out that the Kern defendants had reacquired the shareholders shares before they sold them to the merging company while the MAS XI shareholders' shares were sold directly to the Promoter Defendants. They claim the *Kern* Court's finding that the shareholders were controlled turns on the fact that the shares were reacquired by the defendants before resale. The Court cannot agree.

The *Kern* Court specifically cautioned "We do not intimate that such overwhelming proof of control exercised here is necessary to satisfy the broad definition of 'control' for the purposes of Rule 144." *Id*. at 150 n.3. The fact that the *Kern* defendants reacquired the stock from the shareholders merely provided evidence that they controlled the stock, i.e., that they had the "power to direct or cause the direction of the management and policies" if the shareholders. 17 C.F.R. § 230.405. In this case, Tsai's ability to arrange the transfer of the shares directly to the Promoter Defendants serves the same function. The minor factual distinction between the cases is of little import. The record shows that Tsai arranged the MAS XI shareholders sales of shares, including dictating the prices and amounts of transfers, without the shareholders' knowledge. Those facts are sufficient to demonstrate that Tsai had the power to direct the management of the MAS XI shareholders' shares.

---

he received his compensation in the form of shares and that the $250,000 he forwarded to Tsai was to pay for shares. Regardless, the Court does not believe that his uncorroborated statement creates a genuine issue of material fact on this issue given the abundance of other evidence demonstrating Tsai's control over the shareholders. Moreover, it is undisputed that the Bluepoint shares began trading for $6.00 per share on the OTCBB less than a month after the shareholders received between $0.07 and $0.67 per share.

Next, Tsai notes that he maintained ownership of 95% of MAS XI's shares while the *Kern* defendants were minority shareholders who, nevertheless, controlled the shell company. While this might make the extent of Tsai's control over MAS XI understandable, it does not negate all of the evidence that he controlled the MAS XI shareholders disposition of shares and did not treat them like actual shareholders. Finally, he mentions that the merger in *Kern* was effected by the buyer purchasing shares on the OTCBB via matched orders rather than a reverse merger effected by direct sale of shares to the new investors. Again, this minor distinction is irrelevant to the control question because the *Kern* Court found control based on the actions of the defendants *prior* to the public sale of shares. In short, the Defendants have failed to distinguish *Kern* in any meaningful way.[22]

Second, the Defendants argue that the MAS XI shareholders cannot be deemed "affiliates" because they did not have the power to cause MAS XI to prepare and file a registration statement. Courts have considered whether a person has the power to cause the issuer to prepare and file a registration statement when evaluating whether that person is an affiliate. *See SEC v. Great Lakes Equities Co.*, No. 89-CV-70601, 1990 WL 260587, at *5 (W.D. Mich. Sept. 4, 1990) (defendant was not issuer because he lacked the power to cause the company to file a registration statement). Defendants, however, overlook the fact that a person can be considered an affiliate for several different reasons: (a) because they controlled the

_____

[22] The Defendants also argue that Rule 144(k) should apply because the MAS XI shareholders did not testify that they had a secret agreement with Tsai that he would own the shares in their name. The Court, however, does not believe that any such blatant agreement is necessary either to establish a Section 5 violation or to demonstrate that the Rule 144(k) exemption is inapplicable. Similarly, the Defendants' repeated invocation that they should not be liable for Section 5 violations because their actions "in connection with the reverse merger were consistent with industry practice" are unavailing. (*See, e.g.,* Defs.' S.J. Mem. 14.) There is no "industry custom" exemption to the registration requirement or to satisfying the required elements of the Rule 144(k) exemption.

issuer; (b) because they were controlled by the issuer; or (c) because they were controlled by the same person who controlled the issuer. 17 C.F.R. § 230.144(a)(1).

While the ability to force the issuer to prepare a registration statement may be highly relevant to deciding whether a person is an affiliate because they controlled the issuer, it is less directly predictive when deciding if a person is an affiliate in the other two instances.   7A J. William Hicks, *Exempted Transactions Under the Securities Act of 1933*, § 10.41.5 (2d ed. 2004) (describing the power to force the preparation of a registration statement as a factor relevant to determining who controls the issuer).  A person who is an affiliate because the issuer controlled them or because the person who controlled the issuer also controlled them lacks, by definition, the power to force the issuer to file a registration statement.

Instead, he is considered an affiliate because the person who can force the filing of a registration statement can also force him to sell his shares.  *Id*. at §9.70 ("A person under common control with an issuer has a disability that is shared by a person controlled by an issuer, i.e., he cannot effect a secondary distribution without the prior consent of the control person. Since a control person also controls an issuer, it is not unfair to insist that the person under common control file a registration statement before publicly reselling securities of an issuer"). Where, as here, shareholders are allegedly affiliates because they were controlled by the person who controlled the issuer, the Court agrees with the *Kern* Court that the relevant inquiry is whether the control person exerted "control" over the shareholders as that term is defined by Rule 405.[23]  The sources relied on by the Defendants do not dictate otherwise.

Third, Defendants assert, without explaining how, that the Ninth Circuit's ruling in *Pennaluna & Company, Inc. v. SEC*, 410 F.2d 861 (9th Cir. 1969), is instructive on the control

---

[23]  As discussed above, Tsai admits that he conducted the affairs of MAS XI and there can be no dispute that he controlled MAS XI and had the power to force MAS XI to register its securities.

issue.[24]  The Court has analyzed *Pennaluna*, which addresses the question of whether shares acquired from an escrow account controlled by the control person of an issuer were sold on behalf of the control person, and finds it unenlightening to the questions presented in this case.

The Court has found that the MAS XI shareholders from whom the Promoter Defendants purchased their shares were affiliates.  The MAS XI shareholders also acquired their shares from an affiliate, Tsai.  The Promoter Defendants began selling the shares they acquired from the affiliate-shareholders within one month after purchase.  Therefore, the Rule 144(k) safe harbor is unavailable to the Promoter Defendants because they cannot show that that two years have elapsed from when the securities were acquired from an affiliate and when they were resold.  17 C.F.R. § 230.144(k).  Furthermore, the Court need not address the parties' arguments regarding the proper calculation of the two year holding period because Rule 144(k) cannot apply no matter how long the affiliate-shareholders held the shares.

### b. Section 4(1) Exemption

Defendants claim that the 1997 and 1999 sales to the MAS XI Shareholders and the Promoter Defendants' sales of Bluepoint shares onto the public market are exempt from registration under Section 4(1) of the Securities Act.  The SEC contends that each of these transactions involved an issuer or underwriter and that all of these sales were part of an integrated scheme to distribute shares to the public.  They claim that as a result, Defendants cannot rely on Section 4(1).

---

[24]  Defendants also rely on two SEC "no-action" letters in support of their position.  *BMC Software, Inc.*, SEC No-Action Letter, 1991 SEC No-Act. LEXIS 991 (Aug. 14, 1991); *Intergraph Corp.,* SEC No Action Letter, 2002 SEC No-Act. LEXIS 583 (May 15, 2002).  No-action letters, however, lack precedential effect on this Court.  *Gryl ex rel. Shire Pharm. Group PLC v. Shire Pharm. Group PLC*, 298 F.3d 136, 145 (2d Cir. 2002).  Moreover, those cases are distinguishable because they involved the bona fide gifts of unregistered securities to, respectively, a charity from which the corporate affiliate could inure no benefit and an employee stock-based retirement plan.

Section 4(1) of the Securities Act was created "to cover everyday trading between members of the investing public." *SEC v. N. Am. Research & Dev. Corp*, 424 F.2d 63, 72 (2d Cir. 1970). To this end, it exempts "transactions by any person other than an issuer, underwriter, or dealer" from Section 5's registration requirement. 15 U.S.C. § 77d(1). The exemption applies to transactions, not individuals. *Holschuh*, 694 F.2d at 137. Thus, even if a particular defendant was not an issuer, underwriter or dealer, he is not protected by exemption 4(1) if he participated in a sale or offer of sale by somebody who was an issuer, underwriter or dealer. *Id.* at 138.

An "underwriter" is "any person who has purchased from an issuer with a view to, or offers or sells for an issuer in connection with, the distribution of any security, or participates or has a direct or indirect participation in the direct or indirect underwriting of any such undertaking." 15 U.S.C. § 77b(11). Within that definition, the term "issuer" means not only the company that issued the stocks but also "any person directly or indirectly controlling or controlled by the issuer or any person under direct or indirect common control with the issuer." *Id.* A distribution is essentially synonymous with a "public offering." *Ackerberg v. Johnson*, 892 F.2d 1328, 1336-37 (8th Cir. 1989). The 4(1) exemption is designed to exempt trading in already issued securities and not distributions by issuers or acts by others who engage in steps necessary to such distributions. *Holschuh*, 694 F.2d at 137-138; *Ackerberg*, 892 F.2d at 1335.

Turning first to the 1997 and 1999 sales to the MAS XI shareholders, the Court finds that these transactions do not qualify for the 4(1) exemption because they involved issuers and underwriters. Tsai concedes that he was the controlling person of MAS XI at the time of those transfers he has also admitted that he arranged the 1997 and 1999[25] sales to ensure that that MAS

---

[25] To the extent that Defendants would argue that the 1999 transfer of shares from the five former director shareholders to the 28 additional shareholders should be viewed differently because Tsai was nominally not the seller, the Court is unconvinced. The evidence already discussed in Section IV.A.2.a. demonstrates that Tsai, a statutory issuer actually controlled the

XI could become publicly traded. "A control person such as an officer, director, or controlling shareholder, is an affiliate of an issuer and is treated as an issuer when there is a distribution of securities." *Cavanagh IV*, 445 F.3d at 111 n.12. Consequently, an affiliate cannot rely on the Section 4(1) exemption. *Id*. at 111.

Tsai cannot rely on the exemption for those transactions because he can be viewed alternately as an issuer (due to his controlling status) or as an underwriter (because he purchased from the issuer with a view to distribution). Indeed, the Court finds that no reasonable person could conceive of the "gift" sales to the unwitting MAS XI shareholders as anything other than necessary preliminary links in the daisy-chain of Tsai's overall plan to seek a profit from his shell company by securing public trading status and arranging a reverse merger which would inevitably lead to a public distribution. This conclusion is supported by the evidence in the case, which shows both that Tsai received $250,000 in fees in connection with the reverse merger and that Tsai retained over 450,000 shares of Bluepoint after the merger giving him the opportunity to profit directly by sales to the public.

The Defendants' objection to this conclusion relies on their insistence that each sale of securities preceding and following the reverse merger must be viewed and analyzed in isolation. Thus, because Tsai's sales of securities to the MAS XI shareholders in 1997 and 1999 were not themselves sales to the public, the Defendants argue that those transactions satisfy the Section 4(1) exemption. The Court disagrees. It is apparent from his testimony that Tsai arranged those transfers with a view to subsequent public distribution.

---

transaction and defeats the application of the 4(1) exemption. *Geiger v. SEC*, 363 F.3d 481, 487 (D.C. Cir. 2004) (internal quotation marks omitted) (broker-defendant could not rely on 4(1) exemption for his participation in sale of an unaffiliated private party's shares because the sale was actually controlled by the statutory issuer).

Furthermore, the term "distribution" refers to "the entire process in a public offering through which a block of securities is dispersed and ultimately comes to rest in the hand of the investing public." *Geiger*, 363 F.3d at 487. In this case, the various transfers are properly viewed as a single transaction designed to culminate in public trading. *See Cavanagh IV*, 445 F.3d at 114-116 (various stages of a reverse merger viewed as a single transaction); *Kern*, 425 F.3d at 152-153 (same); *M & A West, Inc.*, 538 F.3d at 1052-53 (same). The fact that each individual transfer may not have involved a sale to the public does not render the transactions immune from registration where the participants clearly (and in Tsai's case expressly) intended the transactions to result in public trading.[26] *See Cavanagh I*, 1 F. Supp.2d at 363 (explaining that the "integration doctrine" "is intended to prevent an issuer from avoiding registration by structuring a transaction in two or more apparently exempt offerings . . . when they actually should be considered a single nonexempt transaction" (internal quotation marks omitted)).

This holding furthers the purpose of the registration requirement which is "to protect investors by promoting full disclosure of information thought necessary to informed investment decisions." *Ralston Purina Co.*, 346 U.S. at 124. Like the reverse merger described in *M & A West*, "the express purpose" of the MAS XI/Bluepoint reverse merger "was to transform a

---

[26] These facts are also fatal to the applicability of the implied Section 4(1)½ exemption. The Defendants suggest in passing that the 1997 and 1999 sales to the MAS XI shareholders were exempted under the Section 4(1)½ exemption. The Section 4(1)½ exemption is an implied exemption so named because it "falls between the cracks of the Sections 4(1) and 4(2) exemptions." *SEC v. Cavanagh*, No. 98 Civ. 1818, 2004 WL 1594818 at *21 (S.D.N.Y. July 16, 2004) (hereinafter *Cavanagh III*). That exemption, assuming that it actually exists, would allow affiliates to sell securities to private investors without registration. *Id*. However, an affiliate claiming the exemption has the burden of proving that the sales "do not constitute a disguised public distribution." *Id*. In this case, the Defendants have failed to create a genuine issue of material fact on whether the 1997 and 1999 sales were qualified private distributions. It is undisputed that Tsai intended the stock to be publicly traded and made those sales as necessary steps in that direction. As the 1997 and 1999 sales were merely links in a chain of transactions designed to result in a public distribution, the implied Section 4(1)½ exemption is inapplicable. *Id*. at *21-22.

private corporation into a corporation selling stock shares to the public, without making the extensive public disclosures required in an initial offering." *M & A West, Inc.*, 538 F.3d at 1053. In this case, the investing public had very little information about Bluepoint. By failing to register their transfers, the Defendants avoided revealing to the public important financial information about the company including that Bluepoint had only earned about $23,000 in revenue the previous quarter and that the Linux operating system it sold could not be fully protected by intellectual property laws. These undisclosed business risks were information to which the general trading public on the OTCBB lacked access. *See Ralston Purina*, 346 U.S. at 124-25 (purpose of the registration requirement is to protect investors by ensuring "full disclosure of information thought necessary to [make] informed investment decisions"). Where, as here, each transfer was taken in furtherance of a later public distribution, the Court will not exalt form over substance by myopically viewing each transfer as an isolated occurrence. *See id.* ("The Supreme Court has long instructed that securities law places emphasis on economic reality and disregards form for substance.")

The Defendants also claim that the Promoter Defendants' sales of Bluepoint shares onto the public market in March and April of 2000 are exempt from registration under Section 4(1) because the Promoter Defendants were not underwriters, issuers, or dealers. They are wrong. The Promoter Defendants cannot invoke the exemption because they were underwriters with respect to those sales, i.e., they purchased from an issuer with a view to distribution. The Promoter Defendants purchased their Bluepoint shares from the MAS XI shareholders. The MAS XI shareholders were "issuers" under the Securities Act because they were "under common control with the issuer," MAS XI.[27] 15 U.S.C. §77b(11). They do not deny that they acquired their shares with the intent to distribute, nor would such an argument be credible as the

---

[27] As discussed in detail in Section IV.A.2.a.

-45-

record shows they sold their shares on the OTCBB approximately one month after purchase during the first day of Bluepoint trading on the OTCBB.[28]  Alternatively, the Promoter Defendants were underwriters because they served as the final link in the chain through which unregistered Bluepoint shares were sold to the public.  17 C.F.R. §230.144 ("Individual investors who are not professionals in the securities business may also be 'underwriters' . . . if they act as links in a chain of transactions through which securities move from an issuer to the public.")

The Promoter Defendants argue that even if they purchased from an affiliate (which they did) they were not engaged in a "distribution" because they sold their shares for their own benefit and not on behalf of Bluepoint.  The case law, including the cases cited by the Defendants, does not support this interpretative gloss on the definition of the term "distribution."  Courts generally equate the term "distribution" with the phrase "public offering."  Hicks, *supra*, §9:18.    A defendant may be deemed an underwriter if he either:  (1) purchased from an issuer "with a view to" offering the securities in a distribution; or (2) sold the securities "for an issuer in connection with" a distribution.  *See Ackerberg*, 892 F.2d at 1336.  The Defendants ignore the first prong of the definition in their argument.  A person is equally an underwriter if he engages in the

_____

[28]  The Promoter Defendants were well aware that Bluepoint would begin OTCBB trading shortly after the reverse merger process during which they acquired their shares.  In fact, even if the Promoter Defendants had not directly sold shares on the OTCBB themselves, the Court would find the Promoter Defendants and Tsai were liable as necessary participants and substantial factors in the unregister sales of Bluepoint stock to the public based on their involvement in the consummation of the reverse merger and public trading.  *Calvo*, 378 F.3d at 1215 (defendant is liable for Section 5 violations if he is a "necessary participant" or a "substantial factor" in an unregistered sale).  For example, in addition to Markow and Yang's substantial involvement in the reverse merger transactions, Markow, Yang, and Goelo were actively involved in the drafting and dissemination of press releases and messages for internet investment chat boards announcing the trading of Bluepoint shares in the lead up to public trading.  *See In the Matter of Testa*, Release No. 33-7018, 1993 WL 391648 (1993) (defendant was a "necessary participant" in an unregistered distribution due to his participation in drafting and disseminating a solicitation letter).  In fact, Markow, Yang, and Goelo's work on the press release and Goelo's posts on the investor message boards while there was no registration statement for Bluepoint's shares, constituted an offer sell in violation of Section 5(c).  *See SEC v. Thomas D. Kielen Corp.*, 755 F.Supp. 936, 941 (D. Or. 1991) (press release can be offer to sell).

distribution to line his own pockets. In short, the underwriter's intent in engaging in the distribution is irrelevant to the determination of his status. *Lybrand*, 200 F.Supp.2d at 393 (a person does not qualify for the 4(1) exemption if he directly or indirectly participated in a distribution, regardless of his intent).[29]

### 3. The SEC's "Non-Fraud" Theory of Liability

As a final matter, the Defendants claim that the SEC cannot assert Section 5 liability "based on a non-fraud violation of Section 5" because the complaint and answers to interrogatories are based on allegations of a fraudulent scheme. According to them:

> [t]he core of the Section 5 violation as alleged by the SEC is fraud (Tsai's "ownership and control" of shares held by "sham" or "nominee" shareholders, and Tsai's sale of these "nominee" shares to the Promoter Defendants for $250,000). There are no allegations whatsoever in the Complaint addressing the circumstance of 33 real shareholders (shareholders who owned the shares for their own benefit and received the proceeds of the sales of their stock in February 2000) and asserting that Tsai had sufficient "control" over their shares to defeat the exemption from registration for sales of their stock.

(Defs.' S.J. Mem. 24.) Consequently, they claim that the Complaint did not give them fair notice of the SEC's charge against them. They also claim that they would have sought additional discovery had they known the SEC would pursue a non-fraud theory.

---

[29] The Defendants also argue, for the first time in their Reply Brief and without citation to legal authority, that Goelo, Geiger (who is not named in Count I), and Richardson (who is not a moving defendant) cannot be underwriters because the shares they sold on the OTCBB were purchased on the open market. The Court will not address this argument, however, as a party may not raise an issue for the first time in its reply brief. *Probst v. Cent. Ohio Youth Ctr.*, 511 F.Supp.2d 862, 871 (S.D. Ohio 2007) ("It is well established that a moving party may not raise an issue for the first time in its reply brief or at oral argument."). Furthermore, conclusory and undeveloped arguments made without citation to legal authority, such as this one, are waived. *See Gen Star Nat'l Ins. Co. v. Administratia Asigurarilor de Sta*t, 289, F.3d 434, 441 (6th Cir. 2002) (undeveloped legal arguments waived); *United States v. Lanzotti*, 205 F.3d 951, 957 (7th Cir. 2000) (explaining that "[i]t is not this court's responsibility to research and construct the parties arguments.") Even if the Court were to reach that argument with respect to Goelo, the Court has already discussed that it would find him liable as a necessary participant in the unregistered distribution of shares.

The Defendants' argument is not well taken. First, the Court is unaware of any legal distinction between a "fraud violation of Section 5" and a "non-fraud violation of Section 5." Section 5 registration violations are strict liability claims. The Defendants concede that scienter is not an element of a Section 5 claim and that the SEC can assert a claim based on non-fraudulent conduct, fraudulent conduct, or both. Therefore, the SEC is not required to prove fraud to establish liability on its registration claim. *See SEC v. Arvida Corp.*, 169 F.Supp.211, 215 (S.D.N.Y. 1958) (defendants violated section 5 even though they acted in good faith).

Second, the Complaint gave the Defendants adequate notice of the claims against them. According to the Sixth Circuit, the function of a federal pleading under Fed. R. Civ. P. 8(a)(2):

> is to give the opposing party fair notice of the nature and basis or the grounds for a claim and a general indication of the type of litigation involved . . . [t]he theory of the pleadings' doctrine, under which a plaintiff must succeed on those theories that are pleaded or not at all, has been effectively abolished under the federal rules.

*Worsharm v. North Carolina Occidental Fire & Cas. Ins. Co.*, 705 F.2d 821, 825 (6th Cir. 1983) (quoting *Oglala Sioux Tribe of Indians v. Andrus*, 603 F.2d 707, 714 (8th Cir. 1979)). The SEC's complaint has more than adequately served this function.

Count 1 of the Complaint sets out the essential elements of Section 5 claim, i.e., each Defendants' use of the mails or interstate commerce to sell or offer to sell unregistered securities:

> From February 2000 through at least July 2000, Defendants Tsai, Markow, Global Guarantee, Goelo, Yang, K & J, Lou, M & M, Sierra, and Richardson, and each of them, directly or indirectly, *made use of* the means or instruments of transportation or communication in *interstate commerce or of the mails to offer and sell securities* through the use or medium of a prospectus or otherwise *when no registration statement has been filed* or was in effect as to such securities and when no exemption from registration was available.

(Complaint ¶ 78 (emphasis added).) The Complaint also references the same stock transfers that form the basis of the SEC Section 5 claim on summary judgment:

Tsai orchestrated a complex scheme to create the appearance that he had distributed MAS shares to dozens of shareholders who were in fact nominees. Tsai then sold this nominee stock to the Promoter Defendants. Yang and Lou resold 220,000 shares to Sierra, which immediately resold shares. Thereafter, all the promoters continued to sell shares they had acquired from Tsai, and Richardson sold the Bluepoint shares he obtained from Sierra. Overall, Tsai, the promoters, Sierra, and Richardson funneled Blue Point Stock into the public trading market without a registration statement in effect.

(*Id.* ¶ 79.)

Furthermore, the background section of the Complaint provides specific facts about each transfer including: that the transfers to the former director shareholder occurred in January 1997 and September 1998; that the "former directors" did not perform any services as directors and did not know they were directors; that Tsai controlled the former directors' shares via blank stock powers; that Tsai arranged the transfer to the 28 additional shareholders in August 1999; that Tsai and Markow arranged the transfer of shares from the MAS XI shareholders to Yang, Goelo, Markow, Lou and their companies on February 17, 2000; and the dates and amounts of the Defendants sales of Bluepoint shares on the OTCBB. (*Id.* ¶¶ 33-37, 47, 53.)

In fact, the Court detects very little difference between the allegations in the Complaint and the SEC's theory on summary judgment. The main difference appears to be that the Complaint alleges that the $250,000 that Markow paid to Tsai in February of 2000 was a direct payment for the 3.75 million MAS XI shareholders' shares, while on summary judgment that payment is construed as a finder's fee paid to Tsai for his role in the merger. The record is clear that this change was spurred by the fact that Markow changed his testimony regarding that payment shortly before the close of discovery.

Although he had repeatedly testified previously that his $250,000 payment to Tsai represented cash to buy shares in MAS XI, (3/1/2002 Markow Test., 69-70, 84, 100), Markow produced an affidavit in support of the Defendants' crime-fraud briefing claiming, for the first

time, that the $250,000 was actually a finder's fee. (11/12/2004 Markow Aff. ¶2.) Regardless of the reason, the change in evidence did not radically alter the nature of the SEC's registration violation claim against the Defendants. At best, the change slightly weakened the strength of the SEC's evidence that Tsai retained control over the MAS XI shareholders and that his transfers to those shareholders were for value. This slight difference did not prevent the Defendants from having sufficient notice of the claims against them.

The Court also notes that the Defendants were given additional notice of the basis of the SEC's Section 5 claims, and even much of the case law it relies in support of that claim during the extensive crime-fraud briefing. (*See* doc. no. 76.) That briefing occurred shortly before the close of discovery. Nevertheless, the Defendants did not seek additional discovery or ask for additional time for discovery despite the considerable insight into the SEC's theory-of-the-case provided by the briefing. The Defendants argue that the crime-fraud briefing did not give them fair notice because it also relied on the fraud theory asserted in the Complaint. Having reviewed the briefing, it is apparent that the SEC addressed Markow's change in testimony and argued that Tsai violated Section 5 even if the $250,000 was actually a finder's fee. (Doc. no. 76, at 19 (arguing that "even setting aside the evidence that Tsai was always the beneficial owner of supposedly gifted shares, his "gifting" benefited him and his company, and thus constituted a sale requiring registration.")) Thus, the crime-fraud briefing previewed before the close of discovery the exact arguments the SEC asserts on summary judgment.

Finally, the Defendants assert that they were prejudiced by the SEC's "belated assertions of a non-fraud violation" because if they had known, they would have sought additional discovery from NASD regarding whether it believed Tsai's "gifts" of MAS XI's shares qualified for an exemption to the registration requirement. Specifically, Defendants claim that they would

have sought discovery regarding: (1) a November 1999 letter in which NASD requested guidance from the SEC regarding whether certain factual scenarios involving shell companies constituted violations of Section 5; (2) NASD's view of the common industry practice in such situations; and (3) whether NASD normally cleared companies for trading in such situations. The Defendants, however, actually sought much of this discovery including, deposing David McClarin, a NASD employee who was involved in clearing MAS XI shares for trading and acquiring expert testimony regarding industry custom in reverse mergers. Furthermore, the Complaint targets the same stock transfers that form the basis of the SEC's motion for summary judgment and the Defendants admit that they never registered MAS XI or Bluepoint stock before any of those transfers. Therefore, the Court is unconvinced that the Complaint did not alert the Defendants that the applicability of the exemptions to the registration requirements would be an important area of discovery.

In sum, the SEC has made out a prima facie case that Defendants violated Section 5(a) of the Securities Act through their unregistered sales of Bluepoint securities and, in addition, that Markow, Yang and Goelo violated Section 5(c) by offering to sell unregistered securities. The Defendants have not demonstrated that any exemptions applied to their transactions. Therefore, the SEC is entitled to summary judgment on this issue.

### B. Section 13(d) & Section 16(a) Disclosure Provision Claims

The parties have also cross-motioned for summary judgment on the SEC's disclosure provision claims, Counts VIII and IX of the Complaint. Those Counts allege that Tsai (individually) violated both sections 13(d) and 16(a), that Yang and Goelo (individually) violated section 13(d); and that the Promoter Defendants (as a group) violated sections 13(d) and 16(a). The disclosure provisions found in sections 13(d) and 16(a) of the Exchange Act require persons

who acquire beneficial ownership of, respectively, 5% or more than 10% of a corporation's stock to disclose their ownership to the SEC.

Specifically, Section 13(d)(1) and Rule 13d-1(a) require a stock purchaser acquiring beneficial ownership of 5% or more of a company's securities to disclose his ownership to the SEC by filing a Schedule 13D within ten days of the acquisition. 15 U.S.C. § 78m(d)(1)(D); 17 C.F.R. § 240.13d-1(a).[30] Information disclosed in the Schedule 13D must be accurate. *See GAF Corp. v. Milstein*, 453 F.2d 709, 720 (2d Cir. 1971). Section 13(d) disclosures must also be updated. Section 13(d)(2) and Rule 13d-2(a) require that the Schedule 13D, be amended promptly whenever there is a "material change"[31] in ownership. 15 U.S.C. § 78m(d)(2); 17 C.F.R. § 240.13d-2(a). Similarly, Section 16(a) and Rule 16a-3 require people who have beneficial ownership of more than 10% of a company to report their ownership with the SEC in a Form 3. 15 U.S.C. §78p(a); 17 C.F.R. §240.16a-3. Any subsequent changes in beneficial ownership must also be reported in a Form 4. 15 U.S.C. § 78p(a); 17 C.F.R. §240.16a-3.

A "beneficial owner" is defined by Rule 13d-3 as "any person who, directly or indirectly, through any contract, arrangement, understanding, relationship, or otherwise has or shares: (1) [v]oting power which includes the power to vote, or to direct the voting of, such security; and/or (2) [i]nvestment power which includes the power to dispose, or to direct the disposition of, such security." 17 C.F.R. § 240.13d-3. A person does not have to hold legal title to the stock or be the person in whose name the stock is issued to be a beneficial owner. *Rosenberg v. XM Ventures*, 274 F.3d 137, 143-44 (3d Cir. 2001). Instead, "the inquiry focuses on any relationship that, as a

---

[30] The information required to be disclosed in the Schedule 13D includes, *inter alia*, the identity and background of the acquiring persons, including whether the person was subject to an order prohibiting or finding violation of state or federal securities law in the last five years. 17 C.F.R. § 240.13d-101. In this case, filing a Schedule 13D would have required Markow to disclose his history of securities law violations.

[31] Under Rule 13d-2(A) "material change" is defined as purchasing or selling shares "in an amount equal to one percent or more" of the outstanding shares. 17 C.F.R. § 240.13d-2(a)

factual matter, confers on a person a significant ability to affect how voting power or investment power will be exercised." *SEC v. Drexel Burnham Lambert Inc.*, 837 F. Supp. 587, 607 (S.D.N.Y. 1993) (internal quotation marks omitted).

Two definitions of "beneficial owner" are used for Section 16 purposes. *Feder v. Frost*, 220 F.3d 29, 33 (2d Cir. 2000). First, to determine if a person is subject to Section 16 based on his "beneficial ownership" of over 10%, the definition of beneficial owner from Section 13(d) applies. 17 C.F.R. § 240.16a-1(a)(1). Once 10% owner status is determined, the second definition is used to determine which shares must be reported under 16(a) as effecting a change in ownership. *Feder*, 220 F.3d at 33. Under the second definition, a person is a beneficial owner of shares if he "directly or indirectly . . . has or shares a direct or indirect pecuniary interest in the equity securities." 17 C.F.R. § 240.16a-1(a)(2). The term "pecuniary interest" is defined broadly as "the opportunity, directly or indirectly, to profit or share in any profit derived from a transaction in the subject securities." 17 C.F.R. § 240.16a-1(a)(2)(i).

*1. Individual Liability for Tsai, Yang, & Goelo*

It is clear from the record that Tsai disclosed his ownership of 8.25 million MAS XI shares by filing a Schedule 13D and a Form 3 with the SEC in April 1999. According to the SEC, however, Tsai violated Section 13(d)(1), Rule 13d-1(a), 16(a) and Rule 16a-3 by filing inaccurate forms that failed to include his beneficial ownership of the 250,000 shares he transferred to the five former directors and by failing to update his 16(a) disclosure by filing a Form 4 to reflect the sale of the 250,000 shares to the Promoter Defendants.

Tsai counters that because the MAS XI shareholders received the full $100 paid for the sales of their stock in February 2000, he did not have a pecuniary interest in the stock as required to trigger the Section 16(a) reporting requirement. The definition of "pecuniary interest,"

however, includes the profits *indirectly* derived from a transaction in the 250,000 shares. In connection with the February 2000 sale of those shares from the MAS XI Shareholders to the Promoter Defendants, Tsai received $250,000. Whether the payment was a "finder's fee" as Tsai and Markow's (later) testimony claims, or a direct payment for the shares as Goelo, Yang, Lou, and Markow's (original) testimony claims, the Court is satisfied that the fact that Tsai ultimately realized a $250,000 profit in connection with a disposition of the 250,000 shares warrants the conclusion that he had a pecuniary interest in those shares. Therefore, Tsai was a beneficial owner and was required to report those shares under Section 16(a).

Tsai also maintains that his investment power over the 250,000 shares was too limited to make him a beneficial owner under Section 13(d). He claims that he only had the authority to sell the MAS XI shareholders shares in connection with a reverse merger and lacked voting power with respect to the shares. Nevertheless, he concedes that he had the power to dispose of the MAS XI shareholders' shares via the blank stock powers. He in fact exercised this power twice: first when he transferred most of the shares held by the five former director shareholders to the 28 additional shareholders in 1999; and then again in 2000 when he sold the MAS XI shareholders' shares to the Promoter Defendants. This means that Tsai had investment power over the 250,000 shares and, thus, beneficial ownership. Tsai has not alerted the Court to any authority suggesting that the limitation on his investment power (that it must be used in connection with a reverse merger) takes it outside of the Section 13(d) definition of beneficial ownership. Moreover, that reading does not square with the express language of Rule 13(d)-3 which states that a beneficial owner may *share* investment power. 17 C.F.R. § 240.13d-3.

Tsai protests that requiring disclosure of the additional 250,000 shares would not further the purposes of Section 13(d)'s reporting requirement because, the market was already aware

that he owned more than 95% of MAS XI through his incomplete disclosure. *Morales v. Quintel Entm't, Inc.*, 249 F.3d 115, 122-123 (2d Cir. 2001) (describing that Section 13(d)'s purpose was to "alert the marketplace to every large, rapid aggregation or accumulation of securities, regardless of technique employed, which might represent a potential shift in corporate control" (internal quotation marks omitted)). Tsai's duties under the securities law, however, was to accurately report his beneficial ownership once it was over 5% and update material changes to those reports. *GAF Corp.*, 453 F.2d at 720 (all information disclosed in a Schedule 13D must be accurate). It was not for him to selectively report his ownership based on his independent assessment of whether or not the market was sufficiently informed. Moreover, the market was unaware that Tsai had control and beneficial ownership of the 250,000 shares. Those shares became 3.75 million shares following the forward stock split and represented the bulk of the (purportedly) freely tradable shares. Tsai violated the disclosure requirements of Section 16(a) and 13(d) by failing to include those shares in his disclosure.[32]

Similarly, Yang and Goelo both individually violated section 13(d) by failing to disclose their beneficial ownership of over 5% of Bluepoint's stock following the reverse merger. The Defendants appear to concede this issue as they fail in their briefs to make any response to the evidence and arguments presented by the SEC on this issue. It is undisputed that Yang and Goelo each acquired over 5% of the outstanding Bluepoint shares following the reverse merger. It is also undisputed that Yang and Goelo never disclosed their ownership to the SEC.

---

[32] Tsai also attempts to resurrect his argument that the SEC must be precluded from relying on a "non-fraud" theory of liability here because it has not proven that the 33 MAS XI shareholders were nominees. As discussed previously in section IV.A.3 with respect to the Section 5 claims, the Court finds that the SEC's Complaint was more than sufficient to give the Defendants notice of the claims against them. Furthermore, the Section 13(d) and Section 16(a) disclosure requirements do not require a showing of scienter. *SEC v. Levy*, 706 F.Supp. 61, 69 (D.C. Cir. 1978) (scienter not element of Section 13(d)); *SEC v. Blackwell*, 291 F.Supp.2d 673, 694 (S.D. Ohio 2003).

Specifically, by February 22, 2000, Yang had beneficial ownership of 1.17 million of Bluepoint's 20 million outstanding shares—over 5%. Yang acquired 500,000 shares from Tsai on February 17, 2000, apparently as compensation for his role as a consultant during the merger negotiations. As a result of Markow's February 22, 2000 letter directing the distribution of the 3.75 million MAS XI shareholders' shares between the Promoter Defendants, Yang acquired an additional 670,000 shares. Of those shares, 450,000 were issued in the name of Yang's company, K & J Consulting and deposited into the company's account at Sierra, which Yang controlled. Another 220,000 of those share were issued in Yang's name and deposited into K & J Consulting's E*Trade account, which Yang controlled.

By March 6, 2000, Goelo had beneficial ownership of 1,015,000 shares of Bluepoint, again over 5% of the total outstanding shares. Specifically, during Markow's distribution of the 3.75 million MAS XI shareholders' shares, Unikay Ltd. and Xplorer, Ltd., two companies controlled by Goelo, acquired a total of 775,000 shares. Goelo's girlfriend, Ana Belloso Canto, also received 200,000 shares. Those shares were deposited in Goelo's account at Sierra on March 6, 2000. Finally, Goelo acquired 40,000 additional shares in the first public sale of Bluepoint stock on March 6, 2000.

Consequently, Yang and Goelo are liable for Section 13(d) violations based on their failure to disclose their individual ownership of over 5% of Bluepoint's shares. Moreover, as discussed below, they are also liable for their group acquisition of those shares.

### 2. Group Liability for the Promoter Defendants

Even if a person beneficially owns less than 5% of a class of securities, he is required to disclose his ownership if he is part of a group which collectively owns 5% or more. *See, e.g., Wellman v. Dickinson*, 682 F.2d 355, 362 (2d Cir. 1982). Under both Section 13(d) and Section

16(a) a group is defined as two or more persons who act as a "group for the purpose of acquiring, holding, or disposing of securities." 15 U.S.C. §78m(d)(3); 17 C.F.R. § 240.16a1(a)(1). The key question in group cases is whether the purported group members agreed to act together for the purpose of acquiring, holding, voting or disposing of the stock. *Morales*, 249 F.3d at 123-24. The agreement need not be formal or written; evidence of "coordinated action" may be sufficient to indicate the existence of a group. *Id.* at 127; *Wellman*, 682 F.2d at 363. Furthermore, the agreement does not have to be an agreement to seek corporate control of to influence corporate affairs. *Morales*, 249 F.3d at 124. "The plain language of § 13(d)(3) demands only an agreement 'for the purpose of acquiring, holding, or disposing of securities.'" *Id.* (quoting Section 13(d)(3))

The SEC contends that the Promoter Defendants, Markow, Goelo, Yang, Lou, and the companies they controlled, acted as a group for the purpose of acquiring the 3.75 million Bluepoint shares from the 33 MAS XI shareholders following the reverse merger. It is undisputed that the Promoter Defendants collectively had beneficial ownership of significantly over 10% of Bluepoint's shares when they acquired 3.75 million shares from the MAS XI shareholders in February 2000.[33] Their liability for Section 16(a) purposes turns on whether they acted as a group for the purposes of acquiring those shares, however, as none of the Promoter Defendants individually held more than 10% of Bluepoint's shares. Similarly, for Section 13(d) liability purposes, Markow and Lou's liability depends on whether they acquired their shares as a group with the other Promoter Defendants because neither of them individually owned 5% of Bluepoint.

Upon a review of the record in this case, the Court concludes that the Promoter Defendants acted as a group for the purposes of acquiring their Bluepoint shares in February

---

[33] In fact, they controlled close to 20% of the total outstanding 20 million shares.

2000. Tsai agreed to arrange to sell the 3.75 million shares held in the names of the 33 MAS XI shareholders to Markow. Markow worked with Tsai to arrange the transfer from those shares to himself and the other Promoter Defendants. The Promoter Defendants communicated with each other about acquiring the shares, and divvying the shares up between them. In early January, Goelo emailed Markow about how to assign shares in the float. (1/9/2000 Email from Goelo to Markow). Goelo also emailed Markow proposing a different distribution of shares between his companies. (1/5/2000 Email from Goelo to Markow). In the letter, Goelo states, "[h]ere is the new break down I agreed to in order to make the deal possible and keep Yongzhi's [Yang's] partner happy . . . There is the issue of controlling more than 5% of the stock of the Company to be considered as well and I may have to split the holdings amongst two Companies: Unikay Ltd and Xplorer Inc." (*Id.*)

On January 7, 2000, Goelo email Yang to tell him that the shares would cost $250,000 in total and how the purchase price should be divided between Goelo, Yang, and Lou. (1/7/2000 Email from Goelo to Yang). Yang then notified Lou. Yang, Goelo, and Lou pooled their money to purchase the shares. The three men each wired their respective portion of the purchase price to Markow. Markow forwarded the money he received to Tsai on February 8, 2000. Tsai then forwarded the stock certificate for the shares and the stock powers to Markow. On February 14, 2000, Markow sent a $100.00 check to pay each of the 33 MAS XI shareholders for their shares. Finally, on February 22, 2000, Markow sent a letter to MAS XI's transfer agent instructing him to re-certify the shares in the names of the Promoter Defendants and companies (or people) they controlled.

The record shows that the Promoter Defendants worked together to acquire and apportion between themselves the 3.75 million shares.[34]  Given the course of events, the Court finds that the Promoter Defendants informally agreed to act as a group for the purpose of acquiring their shares.  Thus, they are a "group" for Section 13(d) and 16 (a) purposes and their holdings are considered collectively.  As the Promoter Defendants collectively had beneficial ownership of more than 10% of Bluepoint's shares they violated Sections 13(d) and 16(a) by failing to disclose their ownership.

Defendants argue that the Court cannot find that the Promoter Defendants acted as a group because there is no evidence that they acted as a group towards any common objective after acquiring the shares—either for the purpose of controlling corporate management or acquiring additional shares.  Merely acting collectively to acquire shares, they claim, is not enough.  In support of this argument, they ask the Court to delve into the legislative history of Section 13(d)(3).  The Court declines to do so.

The applicable statutory definition of a group includes those who act as a "group for the purpose of *acquiring*, holding, or disposing of securities."  15 U.S.C. §78m(d)(3) (emphasis

---

[34]  Markow argues that he cannot be considered part of this group because he was hired as a consultant to facilitate the reverse merger and his fee was paid in stock.  The Court disagrees. First, Markow's testimony regarding whether he bought shares from Tsai or whether his finder's fee was paid in stock is at best contradictory.  Markow's March 1, 2002 testimony he claimed that his  $250,000 finder's fee was paid in cash wired to him by Yang, Goelo, and Lou. (3/1/2002 Markow Test. 83-84)  He further explained that he sent that $250,000 to Tsai to purchase his Bluepoint shares (testimony which he later contradicted claiming the $250,000 was sent to pay Tsai's finder's fee).  (3/1/2002 Markow Test. 83-84, 85).  In comparison, during his 2004 deposition Markow claimed that he took his finder's fee in the form a portion of the 4.5 million tradable shares outstanding after the reverse merger.  (12/3/2004 Markow Dep. 103.) Moreover, whether Markow directly paid for his shares in cash (as his 2002 testimony indicates) or whether he was paid in shares (as his 2004 testimony suggests) he worked with the other Promoter Defendants to ensure that the reverse merger was consummated, a *sine qua non* for their acquisition of Bluepoint stock, and worked together to set an acceptable distribution of the shares between themselves.  The Court finds that under either version of the facts, Markow acquired his shares as part of his collective action involving the other Promoter Defendants, and thus, they acted as a group to acquire their Bluepoint shares.

added).  Under the plain language of the statute joint action for the purpose of acquiring shares is

sufficient.  *Daniel v. Cantrell*, 375 F.3d 377, 383 (6th Cir. 2004) ("Where the plain language of a

statute is clear, however, we do not consult the legislative history.")  The law does not require

"that the narrow object of acquiring, holding, voting, or disposing of securities must itself serve a

broader purpose of seeking corporate control or otherwise exerting influence over corporate

affairs."  *Morales*, 249 F.3d at 125.

The Defendants' reliance on the Seventh Circuit's opinion in *Bath Industries, Inc. v. Blot*,

427 F.2d 97 (7th Cir. 1970), is similarly misguided.  *Bath Industries* dealt with the question of

whether existing shareholders—who did not jointly acquire their stock but who collectively

owned over 10% of the company—were required to disclose their ownership under Section 13(d)

"within 10 days of the time they agreed to act in concert towards any goal, whether or not any

defendant purchased additional  . . . stock in furtherance of that goal."  108-109.  Essentially the

*Bath* Court wrestled with the question of whether existing shareholders were prohibited from

contemplating cooperative action because their joint holdings were more than 10%.  *See id*. at

110.  The Court held that the statute does not prohibit existing shareholders from asserting "their

determination to take over control of management, absent an intention to acquire additional

shares for the furtherance of such a purpose."  *Id*.  Consequently, *Bath* is not on point on the

issue in this case, i.e., whether acting jointly to acquire over 10% of a company triggers

disclosure requirements.  In fact, *Bath* provides support for the proposition that an agreement to

acquire the requisite percentage of shares as a group is statutorily sufficient.  According to the

*Bath* Court, "once the group agrees to act in concert to acquire shares, its members must comply

with the Act's disclosure requirements."  *Id*. at 110.

### C.  Market Manipulation Claims

The SEC alleges that Defendants, Geiger, Markow, Global Guarantee, Goelo, Yang, K&J Consulting, Lou, M & M, Sierra, and Richardson (collectively "Manipulation Defendants") engaged in a "pump-and-dump" scheme which artificially inflated the market price of Bluepoint shares in violation of the anti-fraud provisions of the securities laws, Counts II, III, IV, and VI.[35] According to the SEC, the Manipulation Defendants orchestrated a pump-and-dump scheme to secretly control Bluepoint's tradable shares while inflating the demand for those shares by engaging in manipulative trading activity designed to give the appearance of demand for Bluepoint shares and generate trading momentum.  The SEC further asserts that the Manipulation Defendants engaging in an internet touting campaign designed to drum up demand for the stock.  The SEC claims that the Manipulation Defendants engaged in trading activity that was designed to artificially inflate Bluepoint's price including: repeatedly trading shares between themselves; Sierra's posting of bids and asks; and Sierra's inaccurate reporting of transactions. Geiger and the Promoter Defendants have moved for summary judgment on the market manipulation counts.  The SEC opposes and seeks trial on those counts.

Market manipulation generally refers to trading practices that are intended to mislead investors by artificially affecting market activity.  *Santa Fe Indus., Inc. v. Green*, 430 U.S. 462, 476 (1977); *SEC v. Masri*, 523 F.Supp.2d 361, 367 (S.D.N.Y. 2007).  Manipulation of securities prices violates Section 10(b) and Rule 10b-5 and Section 17(a).  *SEC v. Resch-Cassin & Co*., 362 F.Supp. 964, 975 (S.D.N.Y. 1973).  Section 10(b) of the Exchange Act makes it illegal for any person to "use or employ, in connection with the purchase or sale of any security . . . any

---

[35]  Specifically, the SEC claims that those Defendants violated Section 17 of the Securities Act, Section 10(b) of the Exchange Act and Rule 10b-5 thereunder.  It also claims in the alternative that Markow and Global Guarantee aided and abetted the primary violations committed by the other defendants.  Finally, the SEC claims that Geiger aided and abetted non-moving defendant Sierra's violation of Section 15 (c)(1) of the Exchange Act.

manipulative or deceptive device or contrivance." 15 U.S.C. § 78j(b). Section 10(b)'s

prohibition is not limited to specific types of manipulation but, as Rule 10b-5 states, makes it

unlawful "to engage in any practice, or course of business which operates or would operate as a

fraud or deceit on any person." *Resch-Cassin*, 362 F.Supp. at 975 (S.D.N.Y. 1973) (describing

Section 10(b) and Rule 10b-5 as outlawing every device "'used to persuade the public that

activity in a security is the reflection of a genuine demand instead of a mirage'" (quoting 3 Loss,

*Securities Regulation*, 1549-55 (2d ed. 1961)). In the context of a price manipulation case, the

defendant's failure to disclose that market prices are being manipulated constitutes a material

omission of fact in the offer of securities. *Pagel, Inc. v. SEC*, 803 F.2d 942, 946 (8th Cir. 1986)

Section 9(a)(2) prohibits securities transactions that "creat[e] actual or apparent active

trading in such security" but only applies to stocks listed on the exchanges. Sections 17(a) and

10(b), however, prohibit the same conduct as Section 9(a)(2) with respect to OTCBB stocks, like

Bluepoint. *Resch-Cassin*, 362 F.Supp. at 975; *SEC v. Kimmes*, 799 F.Supp. 852, 859 (N.D. Ill.

1992) (Sections 17(a) and 10(b) prohibit deceptive conduct that stimulates demand for over-the-

counter securities). Similarly, Section 15(c)(1) of the Exchange Act prohibits brokers and

dealers from using "any manipulative, deceptive, or other fraudulent device or contrivance" in

connection with securities transactions. 15 U.S.C.§ 78o(c)(1). "The elements of a cause of

action under 15c(1) are the same as for section 17(a)(1), section 10(b), and Rule 10b-5 except

that Rule 15c1-2 requires that a statement or omission be made only with knowledge or

reasonable grounds to believe that it is untrue and misleading." *Great Lakes Equities Co.*, 1990

WL 260587, at *5.

The SEC must establish scienter to prove violations of Sections 15(c)(1), 17(a)(1), 10(b),

and Rule 10b-5. *Aaron v. SEC*, 446 U.S. 680, 691, 697 (1980) (Section 10(b), Rule 10b-5, and

Section 17(a)(1)); *see Darvin v. Bache Halsey Stuart Shields, Inc.*, 479 F.Supp. 460, 464

(S.D.N.Y. 1979) (15(c)(1)).  Scienter is "a mental state embracing intent to deceive, manipulate

or defraud.  *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 n.12 (1976).  Recklessness is

sufficient to establish scienter for all three provisions.  *SEC v. George*, 426 F.3d 786, 792-93 (6th

Cir. 2005) (applying recklessness as scienter for Section 17(a)(1), 10(b), and 15(c)(1) violations);

*Mansbach v. Prescott, Ball & Turben*, 598 F.2d 1017, 1024 (6th Cir. 1979) (Recklessness

establishes scienter for Section 10(b) and Rule 10b-5 violations).  Recklessness is "highly

unreasonable conduct which is an extreme departure from the standards of ordinary care."

*Mansbach*, 598 F.2d at 1025.  Scienter is not an element of claims under Section 17(a)(2) and

17(a)(3).  *Aaron*, 446 U.S. at 697.

A defendant does not have to buy and sell securities himself for primary liability to be

imposed on a market manipulation claim.  *See SEC v. Sayegh*, 906 F.Supp. 939, 946-47

(S.D.N.Y. 1995) (primary liability imposed for Section 9(a)(2) violation in part because he

directed others to raise their bids).  "Primary liability can be imposed 'not only on persons who

made fraudulent misrepresentations but also on those who had knowledge of the fraud and

assisted in its perpetration.'" *SEC v. First Jersey Sec., Inc.*, 101 F.3d 1450, 1471 (2d Cir. 1996)

(quoting *Azrielli v. Cohen Law Offices*, 21 F.3d 512, 517 (2d Cir.  1994)).  A defendant can also

be secondarily liable for aiding and abetting the securities law violation of a primary violator if

he had a "general awareness that his role was part of an overall activity that is improper" and he

"knowingly and substantially" assisted the violation.  *SEC v. Washington County Util. Dist.*, 676

F.2d 218, 224 (6th Cir. 1982).  In this case, Markow is charged with both primary violations and,

in the alternative, with aiding and abetting the alleged violations of the other Manipulation Defendants.[36]

Manipulation in the securities market context refers to "intentional or willful conduct designed to deceive or defraud investors by controlling or artificially affecting the price of securities." *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 199 (1976). Courts have identified four factors indicating market manipulation: (1) control of the float, i.e., the number of shares available for trading; (2) dominance and control of the market for the security; (3) price leadership; and (4) collapse of the market after the manipulator's activities cease. *SEC v. Martino*, 255 F.Supp.2d 268, 287 (S.D.N.Y. 2003); *Resch-Cassin*, 362 F.Supp. 964 976 (S.D.N.Y. 1973). Determining whether manipulation occurs requires the fact-finder to make "inferences drawn from a mass of factual detail" because "[f]indings must be gleaned from patterns of behavior, from apparent irregularities, and from trading data." *In Re Pagel, Inc.*, Exchange Act Release No. 22,280, 1985 WL 548387, at *3 (Aug. 1, 1985), *aff'd sub nom., Pagel, Inc. v. SEC*, 803 F.2d 942 (8th Cir. 1986). Proof of manipulation exists if "the manipulator caused either actual or apparent activity or caused a rise in the market price." *SEC v. Martino*, 255 F.Supp.2d 268, 286 (S.D.N.Y. 2003) (quoting *Resch-Cassin*, 362 F.Supp. at 976)).

Much of the evidence regarding the SEC's market manipulation claims focuses on the Manipulation Defendants' trading activities on March 6, 2000. While the evidence establishing the trading transactions on that day is basically undisputed, the parties are deeply divided about the inferences to be drawn from that evidence. Essentially, the evaluation of Bluepoint's trading

---

[36] The Court finds that there is a triable issue of fact regarding whether Markow can be primarily liable despite his lack of direct sales or purchases of securities on March 6, 2000 due to the evidence of his substantial involvement in the activities of the other Manipulation Defendants. Markow's involvement is laid out in detail *infra*.

activity constitutes a battle of the experts between Pacheco, the SEC's expert who concludes that the defendants' trading activity shows significant irregularities that suggest manipulation and the Manipulation Defendants' expert[37] who claims that the trading activity does not suggest manipulation. Viewing the evidence in the light most favorable to the non-movant, the Court concludes that summary judgment is inappropriate on the SEC's market manipulation claims.

The SEC has provided ample evidence from which a reasonable jury could conclude that the Manipulation Defendants controlled the float. The record shows that following the reverse merger, Bluepoint had 20 million shares of common stock outstanding; 15.5 million of which were restricted shares held by Bluepoint's Chinese officers and directors. This means that 4.5 million unrestricted, tradable shares were left in the float.[38] As early as January 9, 2000, the Promoter Defendants were discussing how to assign the shares in the float between themselves. The Promoter Defendants acquired 3.75 million of those shares in February of 2000— approximately 83% of the float. Most of those shares were deposited in the Promoter Defendants' accounts at Sierra. Goelo also repeatedly posted messages on the Silicon Investor message board in December of 1999 through January of 2000 in which he told potential investors that Bluepoint's float was "TIGHTLY controlled" and that "We'll sell only to smooth out the spikes."

The SEC has also presented evidence that the Manipulation Defendants attempted to control the supply of Bluepoint's shares by preventing mass sell-offs by the Promoter Defendants who controlled the float. Yang testified that he opened his brokerage account at Sierra on Markow's instruction. Yang explained that Markow wanted a majority of the shares

---

[37] The Defendants' expert has been sanctioned under Rule 11 by a federal court in another securities case. 4/25/1994 Order, *SEC v. Interlink*, Case no. 93 3073 R (C.D. CA. 1994).

[38] In fact, due to Tsai and the Promoter Defendants' registration violations, the shares of the float were not actually freely tradable in this case because they were actually restricted shares.

held by the Promoter Defendants deposited at Sierra because he did not want anybody to dump their shares.  Also in this vein, Markow arranged to sell 5,000 shares to an investor named Kim Giffoni for around $7.00 per share a couple of weeks before trading began.[39]  (Giffoni Dep. 105-06.)  Markow also instructed Giffoni not to sell his shares on the first day of trading "for various reasons, including putting pressure on the stock."  (*Id*. 152-53.)  This agreement was reflected in Sierra's files, which contained an agreement between Markow and Giffoni which stated that Giffoni would receive 10,000 shares in each of Markow's next four reverse mergers if he did not sell more than 500 Bluepoint shares per day.  Richardson testified that he was aware of the agreement.

Furthermore, a reasonable jury could also conclude that Goelo's touting of Bluepoint's stock on internet message boards was part of a larger scheme to excite demand for stock controlled by the Manipulation Defendants.  Robert Zumbrunnen, the administrator of the message board on which Goelo posted, testified that postings on the site can affect the price of a stock, particularly where individuals post multiple messages claiming inside information or claiming that the stock was going to skyrocket.  (12/6/2004 Zumbrunnen Dep. 27-28.)  In various message board posts, Goelo did just that.

Goelo's December 1999 posts, which were sent to several potential investors, boasted that "[t]his company we're reverse merging [Bluepoint] will be the first publicly traded Pure Linux Business in China" and that "[i]t will begin trading at around $4.00 the first day . . . and we'll let all our friends know in advance so they can load up . . . [e]xpect the stock to be trading at $50.00 within a few months."  On January 26, 2000, Goelo sent messages to at least four potential investors telling them "I am involved in a reverse merger of the top Chinese Linux

---

[39] Markow denied at his deposition that he prearranged the sale to Giffoni.  But did testify that he told Geiger that he would pay for Giffoni's purchases if Giffoni could not pay.

Company" he went on to state "I'll give forward notice to some friends to pick up shares before the press release unleashes the frenzy . . . You and friends might be interested to support the stock on the new thread, as I am probably too closely involved in the deal to post myself."

Goelo informed Yang and Markow about his touting, emailing them that "[t]he support on the message Boards is lined up and I'll have the [Bluepoint] threads opening for business on [the message boards] around 9:30 on Friday." Yang testified that he told Goelo not to participate in the posting on the message boards because they had "inside information" and were "insiders." Goelo then asked several people to post information about Bluepoint online and provided them with information about the company. Defendant Armstrong did so, posting dozens of positive messages about Bluepoint on the Raging Bull message board. There is also evidence that Goelo and Markow compensated Armstrong for his posting by sending him stock in several companies.[40] Similarly, the SEC has produced evidence that Ernest Hung posted positive information he received from Goelo at Silicon Investor. Hung testified that Goelo asked him not to reveal Goelo's identify as a Bluepoint shareholder.

The Manipulation Defendants argue that Goelo's email and internet activity is irrelevant because there is no evidence that the specific investors who received the emails later purchased Bluepoint stock.[41] The Court disagrees. To prevail on a market manipulation claim, "the SEC

---

[40]  Armstrong denies that he was compensated and claims that all of the stock he received was paid for out of an $18,750 wire he sent to Goelo. He admitted, however that he received his Bluepoint shares at below market price and that he had no idea why Markow sent him stock. Markow claims that he sent the stock to Armstrong to compensate Armstrong for conducting an online public awareness campaign about stock Markow was interested in. Armstrong contradicts Markow's testimony, however, and denies that he accepted money from Markow or anyone else for promoting stocks on his website.

[41]  The Manipulation Defendants raise similar objections to the SEC's evidence regarding their trading activity. (Defs.' S.J. Reply 37-38, 45-46.) They argue that the Court should grant summary judgment in their favor because the SEC has not offered evidence from individual market participants that they were mislead or their trading activity was influenced by the Defendants' actions and instead relies on "speculation". For the same reasons explained above,

need not identify a specific victim who acted upon the manipulation." *Martino,* 255 F.Supp.2d at 287; *United States v. Haddy*, 134 F.3d 542, 549-50 (3d Cir. 1998) (evidence of investor reliance is not required for conviction in a price manipulation case).

The Manipulation Defendants also contend that the SEC cannot rely on the internet touting evidence because it stated in discovery responses that it did not allege that Goelo made false, misleading, or incomplete statements regarding the market for Bluepoint's stock. The SEC, however, has not introduced the evidence of Goelo's internet touting to show that the statements in the post were false or misleading. Pacheco has testified that the dissemination of new positive information about an issuer, true or false, will increase the price of a security. Therefore, even if the internet posts and emails were not misleading, they are relevant to the overall circumstances of the alleged pump-and-dump scheme because it is another instance of the Manipulation Defendants' attempts to pique investing interest and inflate demand (the pump half of a pump-and-dump). The manipulative nature of the touting campaign is not that Goelo was disseminating false information about Bluepoint in the posts, but that it was designed to inflate investor demand in a trading market that was not driven by the forces of supply and demand but, instead, was affected by the alleged manipulative practices of the Defendants.

The SEC has also produced evidence from which the jury could conclude that the trades between Sierra and the Promoter Defendants in the first few minutes of trading were designed to manipulate the market by creating the appearance of demand where none actually existed. Pacheco has testified that for a stock like Bluepoint, that has never previously traded, the first reported trades are critical for establishing market price. The SEC has also provided support for its position that Geiger, Yang, Goelo, and Lou arbitrarily set the initial price of the stock above

however, the Court finds that the SEC need not produce evidence from victims or prove investor reliance to survive summary judgment or even to prove manipulation.

$5.00 and then manufactured its initial price rise. Yang has testified that he, Markow and Goelo were aware of the importance of keeping Bluepoint's stock price above $4.00 or $5.00 per share to avoid the trading limitations of a penny stock. During the first 11 minutes of trading the following trades occurred:

- Geiger bought 100,000 shares from Yang at $6.00 per share for Sierra's inventory account. The trade was reported as four separate trades of 25,000 shares each;

- Goelo (who already owned 975,000 Bluepoint shares, which he bought for $.01 and $.09 per share during the reverse merger) bought 40,000 shares from Sierra at $6.02 per share;

- Geiger bought 50,000 shares at $6.50 per share from Yang's company, K & J Consulting and Lou's Company M & M.

The SEC has provided evidence which suggests that some of those trades were pre-arranged. Geiger testified that before the first day of trading, Goelo informed him that Yang wanted to sell 100,000 shares for $6.00 per share and that he wanted to buy 40,000 of those shares. Goelo asked Geiger if "two cents would be good" meaning would Geiger sell the 40,000 shares for $6.02—Geiger agreed.[42] There is also evidence that Geiger pre-arranged the sale of 40,000 shares to Richardson and Geiger's family members and co-worker for $6 1/8 per share.

When deciding to buy the first 100,000 shares from Yang at $6.00, Geiger did not rely on the bids (offers to buy) and asks (offers to sell) of other market makers or any market analysis. The only retail demand he was aware of when he agreed to the purchase was the 40,000 shares he planned to sell to his family and co-workers, i.e., market demand generated by Sierra, Geiger, and Richardson. Geiger admitted that he had no information about whether $6.00 was a reasonable price but that he decided to pay that amount because Yang wanted to sell for that amount.[43]

---

[42] Goelo and Yang both contradict Geiger's testimony.

[43] Geiger testified as follows at his deposition

It is also indicative of fraud that Yang's sale of a single block of 100,000 shares was reported in four separate order tickets. Pacheco testified that the fact that the single 100,000 purchase was reported as four purchases of 25,000 shares would have made it impossible for the market to tell if there were multiple buyers and sellers and could have given the false appearance of more demand than actually existed.

The SEC has also produced evidence that Sierra's purchases of 200,000[44] additional Bluepoint shares (at a cost of $700,000) for its inventory in the first few minutes of trading indicates manipulative trading activity. Pacheco describes those purchases as "highly unusual" and states that the behavior would be "extremely risky" in an un-manipulated market, "especially considering that this was a stock that had never traded prior to that day."[45] The Court concludes that a reasonable jury could find that the cross-trades between Sierra and its customers created actual market activity, and were intended to set Bluepoint's initial price above the penny-stock threshold and to create artificial trading momentum. *See In Matter of Robert Grady*, SEC Release No. 34-41309, 1999 WL 222640, at *2 (Apr. 19, 1999) (market-maker's trader violated anti-fraud provisions where he set the initial stock price at $5.00 at the direction of a major shareholder and without conducting an independent determination as to whether the price was appropriate and gradually increased the bid price thirteen times over four weeks).

---

Q. What information did you use, if any, in deciding how much to pay Mr. Yang for his 100,000 shares?
A. Frank [Goelo] said Yongzhi [Yang] wanted to sell 100,000 at $6.
Q. Did you have any information available to you that you used in deciding whether $6 was a reasonable Price?
A. No.
Q. None whatsoever?
A. No.
Q. But you decided to purchase those 100,000 shares at six bucks?
A. Yes.
(11/19/2004 Geiger Dep. 172-73.)
[44] 100,000 from Yang and the two 50,000 share blocks from K & J Consulting and M & M.
[45] The Defendant's expert disagrees with this assessment.

Furthermore, the SEC's evidence, if believed, supports a finding that Sierra had dominion and control of the market, despite the presence of other market makers, and supports that Sierra was a price leader. Where one market participant produces a high percentage of the total trading volume and repeatedly quotes successively higher bids, there is evidence of domination and control. *Reasch-Cassin*, 362 F.Supp. at 976-77 (finding domination and control where defendant accounted for 2/3 of the total market). Pacheco's analysis of the March 6, 2000 trading data shows that from the time of the first Bluepoint trade at 9:42 a.m. until 10:59 a.m.[46] Sierra held the "inside bid" (the highest bid quote) for 69% of the time, while the next most active market maker held the inside bid for only 20% of the time. Similarly, Pacheco testified that as Bluepoint's price rose from $6.02 to $19.50, Sierra accounted for 80% of the trading activity. During that time, Sierra raised its bid seven times to become the inside bid. Over the course of the day, Sierra increased the inside bid a total of 15 times. Additionally, the evidence shows that between 9:42 a.m. and 10:59 a.m., Sierra posted the inside ask (sale price) for Sierra for 92% of the time and that three other market makers posted no asks at all during this time. Pacheco has testified that control over the ask price gave Sierra the ability to push the price higher.[47]

The Manipulation Defendants argue that Pacheco's analysis does not create genuine issues of material fact based on Sierra's trading activity. They posit that there is insufficient

---

[46] Almost all of Sierra's trading activity occurred before the 10:59 a.m. cutoff.

[47] The Court believes these facts distinguish this case from *In re Setteducati*, SEC Release Nos. 33-8334 & 34-48759, 2003 WL 22570689 (Nov. 7, 2003) on which the Manipulation Defendants rely. In *Setteducati*, the SEC concluded that there was insufficient evidence that defendant had manipulated the market. That conclusion, however, was based in significant part on the fact that the *Setteducati* defendant had not caused the price rise in the first "critical" minutes of trading. *Id.* at *4. The SEC found that during the time that the price was escalating the defendant did not raise its bid. *Id.* at *2 Instead, other firms raised the bid and the defendant "did not follow them." *Id.* Furthermore, the *Setteducati* defendant only held the inside ask 2% of the time during the alleged period of manipulation. *Id.* n.18. Conversely, here, the SEC's evidence shows that during the early minutes of trading, while the price was rising, Sierra raised the bid seven times, held the inside bid 69% of the time, and held the inside ask 92% of the time.

evidence that Sierra's trading activity actually caused the price surge from $6 to $21 because other market-makers also raised the inside bid and because other market-makers and broker-dealers purchased shares during the "price surge." (Defs.' S.J. Reply 36-38, 52-53.) The Court finds the Defendants' arguments on this point myopic. First, Pacheco's analysis shows and the Court is aware, that "[t]he price of a security may be raised without raising the bid . . . *[f]ollowing* the market too closely on a rise with either purchases or bids may be just as instrumental in creating a price rise." 8 Louis Loss & Joel Seligman, *Securities Regulation*, 3986.34 (3d ed. Rev'd 1991). Sierra need not have continually held the inside bid during the price rise to raise the price of Bluepoint's shares.

Second, Pacheco's analysis found that Sierra was "long" on Bluepoint stock (i.e., had a number of shares in its inventory), for most of the time that it continued to bid up Bluepoint's price. Bidding up the price of a security while in a long position is indicative of manipulation. *In Matter of R.L. Emacio & Co.*, SEC Release No. 34-4880, 1953 WL 44107, at *3-4 (June 16, 1953) (evidence that the market-maker continued to bid when he was long on stock indicated manipulation). The Manipulation Defendants' various challenges to Pacheco's analysis, while appropriate for cross-examination at trial, do not convince the Court that summary judgment is appropriate.[48]

Third, the Court finds that the SEC has demonstrated that a genuine issue of material fact exists regarding whether the Manipulation Defendants manipulated Bluepoint's stock price with scienter. "Proof of scienter need not be direct" but may be inferred from circumstantial

---

[48] Moreover, the Court notes that the Defendants' expert's analysis ignored trading between Sierra and customers and focused on trades between broker-dealers to the exclusion of an analysis of total market activity. Similarly, the time period selected by the Defendants' expert begins nearly an hour before trading began on March 6, 2000 and ended at 10:28 a.m. which was close in time to the $21 peak price of Bluepoint stock, but ignores a number of subsequent and unusual trading activity by Sierra.

evidence.  *Pagel*, 803 F.2d at 946.  The existence of a motive to manipulate coupled with a series

of manipulative transactions supports a finding of scienter.  *See* Loss & Seligman, *supra*,

3986.37-3986.38.  Based on the record as a whole, including the evidence of Bluepoint's price

movements, the Manipulation Defendants' trading activity, the Promoter Defendants' failure to

report their beneficial ownership of Bluepoint shares (which hid their control from the market),

and various statements by the Manipulation Defendants, a jury could reasonably infer that the

Manipulation Defendants engaged in manipulative market activity to inflate its market price for

the purpose of preventing it from being traded as a penny stock and to ensure that they could

unload their shares at a profit.  *See Masri*, 523 F.Supp.2d at 373 ("In general, the question of

whether a plaintiff has established [scienter] is a factual question 'appropriate for resolution by

the trier of fact'" (quoting *Press v. Chem. Inv. Servs. Corp.*, 166 F.3d 529, 538 (2d Cir. 1999)).

     The SEC has provided evidence from which a reasonable jury could conclude that the

Manipulation Defendants trading activity was part of a successful scheme to artificially inflate

Bluepoint's stock price.  Therefore, the Defendants' Motion for Summary Judgment on Counts

II, III, IV, and VI of the Complaint is **DENIED**.

## D.  Remedies

     The SEC seeks disgorgement with prejudgment interest and permanent injunctions

against Tsai and the Promoter Defendants for their respective violations of their registration and

disclosure obligations.

### 1.  Disgorgement with Interest

     It is well-settled that disgorgement is an appropriate remedy for violations of the federal

securities laws, including reporting and disclosure violations.  *See, e.g.*, *Calvo*, 378 F.3d at 1217

(affirming disgorgement for Section 5 violations and stating "SEC is entitled to disgorgement

upon producing a reasonable approximation of a defendant's ill-gotten gains"); *SEC v. First City Fin. Corp.*, 890 F.2d 1215, 1230 (D.C. Cir. 1989) (§ 13(d)(1) violation); *Friendly Power Co.*, 49 F.Supp.2d at 1372-73 (section 5 violation). The purpose of disgorgement is to deprive wrongdoers of the profits of their illegal conduct and to deter others from violating the securities law; it is not a punitive measure. *Softpoint, Inc.*, 958 F.Supp. at 867; *First City Fin. Corp.*, 890 F.2d at 1230. Where two or more defendants have a close relationship in engaging in the illegal conduct, joint and several liability for the disgorgement amount is appropriate.[49] *Calvo*, 378 F.3d at 1215.

"[T]he proper measure of disgorgement is the amount of the wrongdoer's unjust enrichment. *Softpoint*, 958 F.Supp. at 867. In determining "the amount of money that a defendant must disgorge, the Sixth Circuit has held, by implication, that the entire amount of profits which were illicitly received must be disgorged." *Great Lakes Equities Co.*, 775 F. Supp. at 214 (relying on *SEC v. Blavin*, 760 F.2d 706, 710 (6th Cir. 1985). All doubts concerning the amount of disgorgement must be resolved against the violator. *Id*. at 214 (citing *SEC v. First Fin. Corp.*, 688 F.Supp. 705, 727 (D.D.C. 1988), *aff'd* 890 F.2d 1215 (D.C. Cir. 1980)). The SEC need only show that the amount of disgorgement it requests is a "reasonable approximation of the profits causally connected to the violation." *First City Fin.*, 890 F.2d at 1231. The typical amount of disgorgement in disclosure violation cases is the amount of profit generated by the insider trading. *See, e.g., First Cit. Fin.*, 890 F.2d at 1220-21.

The Court also has the power to order prejudgment interest on the amount ordered to be disgorged. *SEC v. Falbo*, 14 F.Supp.2d 509, 527-28. The purpose of prejudgment interest is to prevent a defendant from "obtaining the benefit of what amounts to an interest free loan" on the

---

[49] Markow, Yang, and Lou do not contest that they may and should be held joint and severally liable with their respective companies in this case.

proceeds of an illegal activity. *SEC v. Moran*, 944 F. Supp. 286, 295 (S.D.N.Y. 1996). The

Court should look to considerations of fairness and equity in determining whether to award

prejudgment interest as well as the length of time the defendants retained the proceeds of the

illicit transaction. *SEC v. Stephenson*, 732 F.Supp. 438, 439 (S.D.N.Y. 1990). The calculation

of prejudgment interest follows the delinquent tax rate for unpaid taxes as determined by the

Internal Revenue Service, and is assessed on a quarterly basis. *See SEC v. First Jersey Securities,*

*Inc.*, 101 F.3d 1450, 1476 (2d Cir. 1996).

The SEC asks this Court to order disgorgement and interest against the Defendants for

their respective registration and disclosure violations in the following amounts:

1. **Tsai** to disgorge $250,000, which represents his profits from the reverse merger, plus $101,987 in prejudgment interest;

2. **Markow & Global Guarantee** jointly and severally to disgorge $1,233,640, which represents the profits from their illicit sales of Bluepoint shares, plus $447,118 in prejudgment interest;

3. **Goelo** to disgorge $216,861 which represents his profits from illicit sales of Bluepoint shares, plus $81,251 in prejudgment interest;

4. **Yang and K & J Consulting** jointly and severally to disgorge $1,195,228, which represents their profits from illicit sales of Bluepoint shares, plus $455,488 in prejudgment interest;

5. **Lou and M & M** jointly and severally to disgorge $1,161,869, which represents their profit from illicit sales of Bluepoint shares, plus $440,296 in prejudgment interest;

The SEC has submitted the appropriate materials to establish that it has correctly calculated the

amount of prejudgment interest for each Defendant's trades. Tsai and the Promoter Defendants

do not challenge the SEC's disgorgement and interest calculations. Instead, they claim that

disgorgement is inappropriate because their profits are not causally related to their registration

and disclosure violations.

First, Tsai argues that because the $250,000 represented his finder's fee, paid to him for his "role in bringing about the MAS XI-Bluepoint reverse merger," it is not causally related to his registration and disclosure violations. This argument has no merit. Tsai admits that the $250,000 was a direct payment for arranging the reverse merger, which would not have occurred absent his violations. It is clear from the record that no reverse merger would have been possible if Tsai had not made MAS XI's shares publicly tradable through the Form 211 process with NASD. It is equally clear that if Tsai had not made it appear that the shares issued in the names of the 33 MAS XI shareholders were exempt from registration, he would not have been able to achieve public trading status. Consequently, his registration violations are causally related to his $250,000 finder's fee because the merger would never have occurred absent his violations. Similarly, Tsai's disclosure violations are causally connected to his reverse merger fee because they occurred in connection with the sales to the MAS XI shareholders that were a necessary prerequisite to the reverse merger. Hence, the Court **GRANTS** the SEC's request for disgorgement and prejudgment interest against Tsai in the amount listed above.

Second, the Promoter Defendants argue that their disclosure violations were not causally related to their profits from their subsequent sales of Bluepoint shares because their failure to report their beneficial ownership was not fraudulent in nature and their disclosure violations are "incidental to the central misconduct charged in the case." (Defs.' Opp'n 38.) The SEC counters that the Promoter Defendants reaped millions of dollars in profits from their unregistered sales of Bluepoint stock. It points out that by failing to obey the registration and disclosure requirements, the Promoter Defendants were able to keep important information from the investing public that would have likely affected investor interest in Bluepoint. The unavailable information included: the fact that the Promoter Defendants controlled a vast

-76-

majority of the float; the fact that they had paid only pennies per share for their stocks a few weeks before public trading began; the fact that Bluepoint's main product was unprotectable by intellectual property laws; and the fact that that Bluepoint had generated almost no revenue at the time trading began.

Courts are not required to engage in counterfactual scenarios to speculate about how much a defendants' disclosure violation inflated the market price of a security. *SEC v. Bilzerian*, 814 F.Supp. 116, 123 (D.D.C. 1993). *Bilzerian*, on which the Promoter Defendants rely, counsels that a "reasonable approximation of defendant's illicit profit is the amount he gained while in violation of the law." *Id*. The SEC's calculation is just that and the Court finds it is a reasonable approximation of the profits causally related to the Promoter Defendants' violations. The case law cited by the Promoter Defendants does not counsel otherwise.

The Promoter Defendants also argue that although scienter is not required to establish a violation, the Court must consider it when deciding whether disgorgement is warranted. The Court is unaware of any such requirement in the relevant legal precedent and the Promoter Defendants have not cited any. Nonetheless, the Court believes that a consideration of the evidence regarding the Markow, Yang, and Goelo's scienter counsels in favor of disgorgement.

The Promoter Defendants were in frequent contact regarding the distribution of shares between themselves. In an email to Markow, Goelo expressly stated his concerns about acquiring over 5% of Bluepoint's stock. His solution, however, was not to report his ownership interest or purchase less stock, but to suggest that his ownership be split between two companies he controlled so his personal name would not appear in connection with the distribution. This email strongly suggests that at least Markow and Goelo were well aware of their disclosure requirements and were intentionally attempting to avoid them. Similarly, Yang instructed Goelo

not to post on the internet message boards because he believed they were "insiders," which also suggests he was aware of his ownership status. Finally, Markow's ultimate distribution of 3.75 million shares suggests a calculated attempt to avoid disclosure; while all of the shares were divided between the Promoter Defendants, companies they controlled, or their close relatives and relations, the breakdown carefully avoids assigning over 2.5% of Bluepoint's total outstanding shares to any one person. Taken as a whole, the evidence indicates that Markow, Goelo, and Yang were well aware of their disclosure responsibilities, were acting to intentionally circumvent them, and, accordingly, their violation of those provisions was at least reckless if not calculating.

Although the evidence of Lou's scienter is not as strong, the Court still believes that the deterrent value of ordering disgorgement against him and his company is great in light of the fact that he committed multiple violations of the securities law during his involvement with Bluepoint. *See SEC v. Blavin*, 557 F.Supp. 1304, 1316 (E.D. Mich. 1983) (concluding that disgorgement was necessary to deter future violations), *aff'd,* 760 F.2d 706 (6th Cir.1985)

The Court is well aware that the "deterrent effect of an SEC enforcement action would be greatly undermined if securities law violators were not to disgorge illegal profits." *Id.* Considering the facts of this case as a whole, the Court concludes that it should order disgorgement of the illegal profits received in this case. For the foregoing reasons, the Court **GRANTS** the SEC's request for disgorgement and prejudgment interest against Goelo; Markow and Global Guarantee; Yang and K & J Consulting; and Lou and M & M in the amounts requested and previously listed.

The SEC seeks permanent injunctions against Tsai[50] and the Promoter Defendants[51] prohibiting them from violating Section 5 of the Securities Act. The SEC also seeks permanent injunctions against Tsai and the Promoter Defendants prohibiting them from violating the disclosure provisions of the Exchange Act. The Court's ability to impose an injunction in securities cases is statutory: "in an action for statutory injunction, once a violation has been demonstrated, the moving party need only show that there is a reasonable likelihood of future violations in order to obtain [injunctive] relief." *Holschuh,* 694 F.2d at 144 (citations omitted); 15 U.S.C. § 77t(b); 15 U.S.C. § 78u(d); *Blavin,* 557 F. Supp. at 1315. In assessing whether there is a likelihood of future violations, the Court must look at the totality of the circumstances. *SEC v. Murphy,* 626 F.2d 633, 655 (9th Cir.1980); *Holschuh,* 694 F.2d at 144.

In examining the totality of the circumstances, the Court should pay special attention to seven factors: (1) the egregiousness of the violations, (2) the isolated or repeated nature of the violations, (3) the degree of scienter involved, (4) the sincerity of the defendants' assurances, if any, against future violations; (5) defendants' recognition of the wrongful nature of their conduct; (6) likelihood that defendant's occupation will present opportunities, or lack thereof, for future violations; and (7) defendant's age and health. *SEC v. Youmans,* 729 F.2d 413, 415 (6th Cir.1984). No one factor is dispositive and a court should weigh each factor in light of the surrounding circumstances of the violation. *See id.* Moreover, the Court is "vested with broad

---

[50] Specifically, the SEC requests that the Court permanently enjoin Tsai from violating §5 of the Securities Act, §13(d)(1) of the Exchange Act, Rule 13d-1(a) thereunder, §16(a) of the Exchange Act, and Rule 16a-3 thereunder.

[51] Specifically, the SEC requests that the Court permanently enjoin Markow, Global Guarantee, Yang, K & J Consulting, Lou, M & M, and Goelo from violating §5 of the Securities Act, §13(d)(1) of the Exchange Act, Rule 13d-1(a) thereunder, §13(d)(2) of the Exchange Act, Rule 13d-2(a) thereunder, §16(a) of the Exchange Act, and Rule 16a-3 thereunder.

discretion in deciding whether to grant injunctive relief." *SEC v. Lawbaugh,* 359 F.Supp.2d 418, 424 (D.Md. 2005).

       a.   <u>Tsai, Markow and Global Guarantee, Yang and  K & J Consulting, and Goelo</u>

The Court has little difficulty in finding a reasonable likelihood of future violations on the part of Tsai, Markow and his company, Yang and his company,[52] and Goelo.  Most of these Defendants are recidivist securities law violators.[53]  In 2005, Tsai was sanctioned by the Middle District of Florida for registration violations.  In connection with that case, Tsai was permanently enjoined from violating the registration provisions.  Similarly, Markow has been censured in two states for violations of state securities law and has been found to have committed securities violations by three NASD arbitration panels.  Yang was sanctioned by the Central District of California in 2005 for his violations of the antifraud and registration provisions during a pump-and-dump scheme.  That court enjoined Yang from committing future violations of the antifraud and registration provisions.  In short, Tsai, Markow, and Yang's, histories of securities law violations suggest that they are likely to commit future offenses and counsel heavily in favor of granting injunctive relief.  *See, e.g., Murphy*, 626 F.2d at 655 (existence of past violations may create an inference that there will be future violations).

None of the Defendants has provided sincere assurances that they will not offend in future or acknowledged in any way the wrongful nature of their conduct.  Turning to the egregiousness of the conduct and the Defendants' level of scienter, the Court has already explained that there is substantial evidence that Yang, Markow, and Goelo acted at least

---

[52]  As Yang and Markow's companies (K & J Consulting and Global Guarantee) were under the complete control of those defendants, the Court's conclusion that Yang and Markow should be permanently enjoined supports the imposition of injunctions against their companies.

[53]  The Court notes that Goelo does not have a documents history of securities violations, however, the evidence of his scienter in this case is sufficient to convince the Court that there is a sufficient likelihood of future violations on his part that an injunction is warranted.

recklessly in violating the securities law.  Given that and the fact that they repeatedly flouted the requirements of the securities law in connection with their sales of unregistered Bluepoint stock, the Court finds their violations egregious.  This is especially true given Yang and Markow's substantial experience in the securities industry.

Similarly, the Court finds Tsai's multiple violations were egregious and the attendant circumstances suggest that he was also reckless in committing his violations.  He committed multiple violations despite his obvious experience in the securities industry and his substantial education regarding very regulations he violated (as evidenced by his successful passage of five licensing exams).  Additionally, the record shows that Tsai lied to NASD to carry out his violations.  In his Form 211 filing, Tsai reported that he transferred shares to the five "former director" shareholders as compensation for their services as directors.  Tsai has admitted however, that three of the purported former directors never performed any services for MAS XI and that he cannot remember if the other two did.[54]

Further, Tsai and Markow have significant employment histories in the securities industry, which gives them an avenue for potential future violations.  Goelo is not a securities industry specialist.  His violations, however, were committed in connection with his role as an investor and nothing prevents him from committing similar violations in connection with future investment opportunities.  Finally, while there is some evidence that Markow has health problems, none of the Defendants has argued that their age or health precludes future violations.

---

[54] Tsai suggests that he did not lie in his Form 211 filing because the five former directors were "honorary directors" even though they performed no services for MAS XI.  The Court is unmoved by this distinction.  Tsai did not tell NASD that the five former directors were being compensated for holding the titular position of honorary director.  Instead, he reported that they were "former directors" who received shares as "compensation for their services," which Tsai admits were non-existent.

The Defendants argue that scienter is the most important factor when considering awarding an injunction and that the evidence of their scienter is insufficient to warrant an injunction. Their position somewhat misstates the law. *Calvo*, 378 F.3d at 1216 ("While scienter is an important factor in this analysis, it is not a prerequisite to injunctive relief"). According to the Sixth Circuit, when evaluating the imposition of injunctive relief in a securities case, "no one factor is determinative." *Youmans*, 729 F.2d at 415. Nonetheless, the Court agrees that scienter is an important factor. But as set forth above, the Court finds there is strong evidence of scienter with regards to Markow, Yang, Goelo, and Tsai.

The Defendants also argue that the unsettled state of the law regarding the application of the registration requirements to transactions involving shell companies demonstrates their good faith. It is true that at the time of Defendants' violations the NASD had not yet, as it subsequently has, explicitly prohibited the Defendants actions. In July 2000, NASD issued a notice to its member, NASD Notice to Members 00-49 (July 2000), informing them that it would no longer clear for trading gifted shares of shell company securities in the types of circumstances present in this case. However, a review of that Notice reveals that the NASD staff had already publicly asked for guidance on whether such transfers violated Section 5 of the Securities Act in November 1, 1999. As a consequence, the Defendants should have been on notice that their behavior may have violated the registration provisions even if the NASD only officially proscribed the practices a few months later. Moreover, the Defendants have no similar excuse for their violations of the disclosure provisions. This alone is not enough to convince the Court that permanent injunctions are inappropriate in this case.

The Defendants also contend that NASD's clearance of MAS XI's shares for public trading makes their actions reasonable. There are two problems with this assertion. First,

undisputed record evidence shows that Tsai lied about the nature of the transfers to the five

"former director" shareholders in his Form 211 filings.  His dishonesty in the filings that were

the basis of NASD's decision to permit public trading precludes his reliance on that decision as

evidence of his good faith.  Second, NASD's letter clearing MAS XI for trading specifically

cautioned:

> [p]lease be advised that in clearing [MAS XI's] filing it should not be assumed
> that any federal, state, or self-regulatory requirements other than Rule 6740 and
> Rule 15c2-11 have been considered.  Furthermore this clearance should not be
> construed as indicating that the NASD has passed upon the accuracy or adequacy
> of the documents contained in your Rule 15c2-11 submission.

(12/13/1999 NASD Letter).  In addition the NASD employee who was responsible for clearing

MAS XI shares testified that NASD did not conduct a merit review of the Form 211 filing and

that he assumed the information he received from MAS XI was accurate.

 Considering all the *Youmans* factors, the Court concludes that there is a likelihood that

Tsai, Markow, Yang, Goelo, K & J Consulting (Yang's company), and Global Guarantee

(Markow's company) may commit securities violations in the future.  It is appropriate to issue

permanent injunctions against them.  Therefore, the Court **GRANTS** the SEC's request for

permanent injunctions against those Defendants.

### b. Lou and M & M

The SEC has also requested permanent injunctions against Lou and his company M & M.

In this instance, however, the Court does not believe a permanent injunction is warranted.  Lou

has no previous record of securities law violations, unlike Tsai, Markow, and Yang.  That fact

was also true of Goelo, against whom the Court ordered an injunction. There was, however,

documentary and strong circumstantial evidence demonstrating that Goelo committed his

violations with scienter.  The SEC has pointed to no such similar evidence with regards to Lou.

Considering the totality of the circumstances, the Court finds that the SEC has not sufficiently established a likelihood that Lou and M & M will commit future securities violations. The Court believes the imposition of disgorgement against Lou and his company will constitute a sufficient deterrent. As such, the SEC's request for a permanent injunction against Lou and M & M is, therefore, **DENIED**.

## V. CONCLUSION

For the reasons set forth above, the SEC's Motion for leave to supplement its motion for summary judgment with additional legal authority (doc. no. 208), is **GRANTED.** The Defendants' Motion for Summary Judgment (doc. no. 112) on the Registration Provision Claim (Count I); the Anti-Fraud Provision Claims (Counts II, III, IV, and VI); and the Disclosure Provision Claims (Counts VIII and IX) is **DENIED** in its entirety. The SEC's Partial Motion for Summary Judgment (doc. no. 124) is **GRANTED in PART** and **DENIED in PART**. As explained below the Court:

(1)     **GRANTS** Summary Judgment against Tsai, Markow, Global Guarantee, Yang, K & J Consulting, Lou, M & M, and Goelo on Count I, liability for violating Section 5 of the Securities Act;

(2)     **GRANTS** Summary Judgment against Tsai, Markow, Global Guarantee, Yang, K & J Consulting, Lou, M & M , and Goelo on Count VIII, liability for violating Section 13(d)(1) and Rule 13d-1(a) thereunder;

(3)     **GRANTS** Summary Judgment against Markow, Global Guarantee, Yang, K & J Consulting, Lou, M & M , and Goelo on Count VIII, liability for violating Section 13(d)(2) and Rule 13d-2(a) thereunder;

(4)     **GRANTS** Summary Judgment against Tsai, Markow, Global Guarantee, Yang, K & J Consulting, Lou, M & M , and Goelo on Count IX, liability for violating Section 16(a) and Rule 16a-3 thereunder;

(5)     **GRANTS** a disgorgement order against Tsai in the amount of $ 250,000.00 plus $101,987.00 in prejudgment interest;

(6)      **GRANTS** a disgorgement order against Markow and Global Guarantee, jointly and severally, in the amount of $1,233,640.00 plus $447,118.00 in prejudgment interest;

(7)      **GRANTS** a disgorgement order against Goelo in the amount of $216,861.00 plus $81,251.00 in prejudgment interest;

(8)      **GRANTS** a disgorgement order against Yang and K & J Consulting, jointly and severally, in the amount of $1,195,228.00 plus $455,488.00 in prejudgment interest;

(9)      **GRANTS** a disgorgement order against Lou and M & M, jointly and severally, in the amount of $1,161,869.00 plus $440,296.00 in prejudgment interest;

(10)    **GRANTS** a permanent injunction against Tsai, permanently enjoining and restraining him and his officers, agents, servants, employees, attorneys and all persons in active concert or participation with him who receive actual notice of this Order by personal service or otherwise, from violating, directly or indirectly, Sections 5(a) and 5(c) of the Securities Act [15 U.S.C. §§ 77e(a) and 77e(c)], Sections 13(d)(1) and 16(a) of the Exchange Act [15 U.S.C. §§ 78m(d)(1) and 78p(a)] and Rules 13d-1 and 16a-3 thereunder [17 C.F.R. §§ 240.13d-1(a) and 240.16a-3];

(11)    **DENIES** a permanent injunction against Lou and M & M;

(12)    **GRANTS** a permanent injunction against Markow, Global Guarantee, Yang, K & J Consulting, and Goelo, permanently enjoining and restraining them and their officers, agents, servants, employees, attorneys and all persons in active concert or participation with him who receive actual notice of this Order by personal service or otherwise, from violating, directly or indirectly, Sections 5(a) and 5(c) of the Securities Act [15 U.S.C. §§ 77e(a) and 77e(c)], Sections 13(d)(1), 13(d)(2), and 16(a) of the Exchange Act [15 U.S.C. §§ 78m(d)(1), 78m(d)(2) and 78p(a)] and Rules 13d-1, 13d-2, and 16a-3 thereunder [17 C.F.R. §§ 240.13d-1(a), 240.13d-2(a), and 240.16a-3].

A date for trial on Counts II, III, IV, and VI (the Anti-Fraud Provision Claims), will be set by a forthcoming scheduling order.

        **IT IS SO ORDERED.**

                         **s/Algenon L. Marbley**
                      **ALGENON L. MARBLEY**
                      **UNITED STATES DISTRICT COURT**

**Dated: March 31, 2009**